In re ILLINOIS BELL SWITCHING STATION LITIGATION

First District (2nd Division)   No. 1—89—0974

Opinion filed June 30, 1992.*

*On October 23, 1992, the Appellate Court, First District, withdrew the July 30, 1991, opinion in case No. 1—89—0974, published at 218 Ill. App. 3d 224. A new opinion was subsequently filed June 30, 1992.

SCARIANO, J., dissenting.

Joyce & Kubasiak, P.C., William J. Harte, Ltd., and Karla Wright, Ltd., all of Chicago, and DiTommaso & Berman, of Oak Brook (Edward T. Joyce, William J. Harte, and Karla Wright, of counsel), for appellants.

Kirkland & Ellis, of Chicago (Frank Cicero, Jr., P.C., J. Andrew Langan, Susan P. Jordan, and Walter R. Lancaster, of counsel), for appellee.

JUSTICE DiVITO delivered the opinion of the court:

Plaintiffs filed a complaint, framed as a class action representing customers of defendant Illinois Bell Telephone Company (Bell), against Bell, alleging economic damages as a result of a fire in Bell's Hinsdale, Illinois, switching station which disrupted service for one month. Counts I and II of plaintiffs' complaint alleged violations of the Illinois Public Utilities Act (the Act) (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 1—101 et seq.), count III alleged common law willful and wanton misconduct, count IV alleged breach of contract, and count V sought a declaratory judgment that a provision in Bell's tariff did not bar their claims. The circuit court dismissed counts I through IV and granted summary judgment for Bell on count V. Plaintiffs appeal the court's order pertaining to counts I, II, and V, raising as issues (1) whether a limitation of liability clause in Bell's tariff bars recovery for economic losses resulting from interruptions in telephone service; and (2) whether the *Moorman* doctrine (*Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 435 N.E.2d 443) bars tort claims for economic losses due to alleged willful and wanton misconduct in actions brought pursuant to the Act. Ill. Rev. Stat. 1987, ch. 111²/₃, par. 5—201.

The subject of the present litigation is Bell's telephone switching station in Hinsdale, Illinois. Bell has five such switching stations, which route and direct telephone calls over particular geographic areas. The Hinsdale station services the western and southwestern suburbs of Chicago and is able to process 3.5 million calls per day.

In order to protect the computer equipment and cables housed in its Hinsdale station from fire, Bell equipped it with an automatic fire sensor which would detect the presence of fire. In addition, Bell equipped the Hinsdale station with a fire alarm which would sound if a fire was detected; the alarm was connected so that, if sounded, it would register in Bell's office in Springfield, Illinois. Bell, however, did not connect the alarm to a local fire or police de-

partment. Further, although the Hinsdale station was automated and usually devoid of people, Bell did not install automatic fire-fighting equipment, but merely bolted manual extinguishers on the walls of the station.

On the afternoon of May 8, 1988, a fire started in Bell's Hinsdale switching station. No one was in the station at this time; however, the fire alarm was triggered and, at 3:50 p.m., registered for nine consecutive minutes in Bell's Springfield office. After the alarm sounded, Bell did not respond. The fire triggered a second alarm in Bell's Springfield office at 4:20 p.m.; however, Bell again did not respond in any manner to the fire.

At 4:50 p.m., someone passing the Hinsdale station saw smoke coming from the building and alerted the fire department. Although the fire department arrived within minutes, the Hinsdale station was already consumed by fire and the contents of the station destroyed. Consequently, telephone service to the western and southwestern suburbs of Chicago ceased.

Because of the fire damage, telephone service to the area affected was disrupted for approximately one month; as a result of the disruption in service, numerous Bell customers filed class action lawsuits against Bell. The cases were eventually consolidated and an amended joint class action complaint was filed. Bell moved to dismiss the complaint for failure to state a cause of action, and the circuit court granted Bell's motion.

Plaintiffs then filed a second amended joint class action complaint containing five counts: counts I and II contained allegations that Bell violated several provisions of the Act and the Illinois Commerce Commission rules, count III alleged willful and wanton negligence, count IV alleged breach of contract, and count V sought a declaratory judgment that the exculpatory language in Bell's tariff did not bar the action. Bell again moved to dismiss the complaint and the circuit court granted Bell's motion, dismissing counts I through IV and awarding summary judgment for Bell on count V. Plaintiffs appeal the court's dismissal of counts I and II, and the award of summary judgment on count V.

I

Plaintiffs initially contend that Bell's tariff, filed with the Illinois Commerce Commission (ICC) in accordance with the Act, is in contravention of the Act, and thus does not protect Bell from liability for interruption in service. Moreover, although the tariff, which describes the "terms and conditions of service," preempts any con-

tract expectancy from customers and contains an exculpatory clause which bars recovery for consequential damages due to interruptions in service, plaintiffs maintain that it is against public policy and should thus not bar plaintiffs' claims.

In response, Bell contends that the tariff is not against public policy and, further, that the tariff, accepted by the legislature for 50 years, legally defines the limits of its liability for interruptions in service. Consequently, Bell maintains that the tariff bars plaintiffs' claims.

The most recent tariff, like other tariffs filed by Bell going back several decades, lists among its general "regulations" a service interruption liability exclusion. That exclusion provides as follows:

"The liability of the Company for damages arising out of mistakes, omissions, interruptions, delays, errors or defects in transmission occurring in the course of furnishing service *** shall in no event exceed an amount equivalent to the proportionate charge to the customer for the period of service during which such mistake, omission, interruption, delay, error or defect in transmission occurs. No other liability shall in any case attach to the Company." Illinois Bell Telephone Company Tariff, Illinois Commerce Commission No. 5, pt. 1, §5, par. 3.1.

■ Plaintiffs predicate their claims upon Bell's duties pursuant to the Act and the ICC rules. The Act requires a public utility to provide "adequate, efficient," and "reliable" service. (Ill. Rev. Stat. 1987, ch. 111⅔, pars. 8—101, 8—401.) The ICC rules require Bell to "adopt and pursue a maintenance program aimed at preventing service interruptions" and to "make reasonable provisions to meet emergencies resulting from *** fire[s]." (83 Ill. Adm. Code §§730.402(a), 730.408(a) (1985).) Plaintiffs assert that Bell, in failing to provide automatic fire-fighting equipment and in failing to respond to the alarms which sounded in its Springfield office, violated both the Act and ICC rules. Consequently, plaintiffs argue that Bell should not be able to escape liability by use of exculpatory language in contravention of both the Act and the ICC rules.

Neither the Act nor the ICC rules, however, specify whether the duty to provide entirely uninterrupted phone service is included in the description of adequate, efficient and reliable service. Rather, both the Act and ICC rules are silent on this point and address only general requirements of reliable and efficient service. It cannot be said that reliable and efficient service necessarily includes continuous, uninterrupted service.

Bell is nowhere charged with the duty to provide completely uninterrupted service, but rather, is required to provide "service and facilities which are in all respects adequate, efficient, reliable and environmentally safe and which \*\*\* constitute the least-cost means of meeting the utility's service obligations." (Ill. Rev. Stat. 1987, ch. 111⅔, par. 8—401.) Furthermore, in enacting the Act, the legislature intended that "[t]elecommunications services should be available to all people of the State of Illinois at just, reasonable and affordable rates and be provided as widely and economically as possible." (Joint Committee on Public Utility Regulation (April 1985), at 21.) Consistent, then, with the legislature's dictate that Bell provide cost-effective service, Bell is required to file a tariff "which describes the nature of the service, applicable rates and other charges, [and] terms and conditions of service." Ill. Rev. Stat. 1987, ch. 111⅔, par. 13—501.

Moreover, while plaintiffs contend that the ICC has never approved of the tariff and Bell's customers had no input as to the contents of the tariff, the ICC has expressed an opinion that interruption of service complaints are limited by Bell's tariff. (*Menco v. Illinois Bell Telephone Co.*, No. 84—0277 (Illinois Commerce Commission, Oct. 17, 1984).) Correspondingly, a reasonable interpretation of a statute by an agency charged with enforcement of that statute is entitled to great weight. (See *Pielet Brothers Trading, Inc. v. Pollution Control Board* (1982), 110 Ill. App. 3d 752, 756, 442 N.E.2d 1374.) Though a court of review is not bound by an agency's interpretation of law, "the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong, especially when [the legislature] has refused to alter the administrative construction." *Red Lion Broadcasting Co. v. Federal Communications Comm'n* (1969), 395 U.S. 367, 381, 23 L. Ed. 2d 371, 383-84, 89 S. Ct. 1794, 1802; see *NLRB v. Hendricks County Rural Electric Membership Corp.* (1981), 454 U.S. 170, 177, 70 L. Ed. 2d 323, 330, 102 S. Ct. 216, 222.

In *Menco*, a Bell customer brought suit against Bell to recover damages when its computer was put out of service for 15 days due to a malfunction in Bell's equipment. After an evidentiary hearing, the ICC explicitly implemented the tariff by applying the liability exclusion provision in dismissing Menco's complaint which sought recovery of economic losses suffered as a result of the temporary service interruption. *Menco v. Illinois Bell Telephone Co.*, No. 84—0277 (Illinois Commerce Commission, Oct. 17, 1984).

Furthermore, in *J. Meyer & Co. v. Illinois Bell Telephone Co.* (1980), 88 Ill. App. 3d 53, 409 N.E.2d 557, and *Sarelas v. Illinois Bell Telephone Co.* (1963), 42 Ill. App. 2d 372, 192 N.E.2d 451, this court held that Bell's duty to its customers is determined by the particular provisions of the tariff on file with the ICC.

In *Sarelas*, a Bell customer filed suit against Bell alleging that Bell disconnected his telephone for 2½ hours, thereby violating its legal duty to provide service. In affirming the dismissal of the plaintiff's complaint, the *Sarelas* court held that "the extent to which [Bell] owed plaintiff 'a legal duty' is determined by the particular provisions of the tariff on file with the commission; there is no contract in this case on which plaintiff can rely, nor are his allegations of a breach of duty sufficient to constitute a claim in tort. He complains simply of the disconnection of his telephone ***." *Sarelas*, 42 Ill. App. 2d at 375.

In *J. Meyer & Co.*, the plaintiffs sued for damages sustained in a theft at their warehouse when burglars circumvented an alarm system which was connected to Bell's equipment. The plaintiffs alleged willful and wanton misconduct by Bell because Bell allegedly knew of other, similar burglaries and placed its junction box, with easily identifiable alarm wires, in an easily accessible location. In affirming the dismissal of the plaintiffs' suit, the appellate court held that "the source of any duty of Illinois Bell, as a public utility, to its subscribers is only in the tariff as filed." *J. Meyer & Co.*, 88 Ill. App. 3d at 55.

Like plaintiffs in the instant case, the *J. Meyer & Co.* plaintiffs sought to circumvent the tariff by relying upon the statutory language requiring utilities to provide service "as shall promote the safety, health, comfort and convenience of its patrons, employees, and public" (Ill. Rev. Stat. 1975, ch. 111⅔, par. 32, now Ill. Rev. Stat. 1987, ch. 111⅔, par. 8—101). The court rejected this argument, holding that "a review of the relevant decisions discloses that section 32 [now section 8—101] does not require that a public utility render particular types of primary services" and that "the tariff is the sole source of any duty owed" by Bell. *J. Meyer & Co.*, 88 Ill. App. 3d at 56.

Plaintiffs further contend that to allow Bell to immunize itself against gross negligence and willful misconduct is unreasonable and does nothing to further the public good. Plaintiffs maintain that the courts of several States are split on the question of whether a telephone company may limit its liability for defects in service. Both plaintiffs and Bell cite to numerous jurisdictions for the proposition

that the tariff's exculpatory language is either against or not against public policy when damages result from allegedly willful and wanton misconduct on the part of Bell. A review of the cases, however, discloses that none are precisely on point; rather, several deal with exculpatory clauses in private contracts and others address advertising in telephone directories.

Further, it should be noted that the apparent diversity of opinion seems to a great extent to be merely a function of the diversity of legislation on this question and on closely related matters existing in the various jurisdictions in which this question has been addressed. However, as Bell argues, those cases are neither binding nor persuasive, particularly where Illinois courts have upheld the tariff's liability exclusion on an allegation of willful and wanton misconduct. *J. Meyer & Co.*, 88 Ill. App. 3d 53.

Notwithstanding plaintiffs' arguments that the tariff should not operate to bar claims for damages resulting from Bell's willful and wanton misconduct, "[w]ithout the limitations on liability set forth by the tariff, [Bell] would be uniquely vulnerable to claims based on signal transmission defects which may result from a variety of causes, adversely affecting its ability to fulfill the public need for reasonable telephone service charges." *J. Meyer & Co.*, 88 Ill. App. 3d at 57.

■ We agree with the California Supreme Court when it stated, in *Waters v. Pacific Telephone Co.* (1974), 12 Cal. 3d 1, 7, 523 P.2d 1161, 1164, 114 Cal. Rptr. 753, 756:

"The theory underlying [decisions upholding the right of regulated utilities to limit their liabilities] is that a public utility, being strictly regulated in all operations with considerable curtailment of its rights and privileges, shall likewise be regulated and limited as to its liabilities. In consideration of its being peculiarly the subject of state control, 'its liability is and should be defined and limited.' [Citation.] There is nothing harsh or inequitable in upholding such a limitation of liability when it is thus considered that the rates as fixed by the commission are established with the rule of limitation in mind. Reasonable rates are in part dependent upon such a rule."

See also *Stern v. General Telephone Co.* (1975), 50 Cal. App. 3d 538, 123 Cal. Rptr. 373.

■ If Bell's liability were extended to all those who suffered pecuniary loss, its liability would become grossly disproportionate to its fault. We hold that prior Illinois authority and legislative intent require the conclusion that the exculpatory language in Bell's tariff

properly limits claims from disruption of service to a rebate of the costs for the missed service. Because "[w]here the legislature chooses not to amend a statute after a judicial construction, it will be presumed that it has acquiesced in the court's statement of legislative intent" (*Miller v. Lockett* (1983), 98 Ill. 2d 478, 483, 457 N.E.2d 14), we find that the exculpatory language in the tariff, accepted for decades in Illinois, is neither in contravention of the Act or ICC rules nor against public policy, and thus, bars plaintiffs' claims.

## II

Plaintiffs next contend that Bell failed to satisfy its duties pursuant to the Act (Ill. Rev. Stat. 1987, ch. 111²/₃, pars. 8—101, 8—104, 8—501). Plaintiffs maintain that the statute requires utilities to provide "adequate," "reliable," and "efficient" service and facilities; if the utility fails to provide that which is required, it is "liable *** for all loss, damages or injury caused thereby." Ill. Rev. Stat. 1987, ch. 111²/₃, pars. 5—201, 8—401.

■ In response, Bell contends that, although the Act requires it to provide adequate, reliable, and efficient service, the Act does not provide standards for determining whether a utility is in compliance and, thus, common law tort principles apply. Bell maintains that because plaintiffs' purely economic losses, based on expectation damages, have no legally cognizable basis in tort, plaintiffs' claims are barred by the *Moorman* doctrine. *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 435 N.E.2d 443 ("When the defect is of a qualitative nature and the harm relates to the consumer's expectation that a product is of a particular quality ***, contract, rather than tort, law provides the appropriate set of rules for recovery").

The applicable provisions of the Act under which plaintiffs base their claims provide that "[e]very public utility shall furnish *** facilities *** in all respects adequate, efficient, just and reliable" (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 8—101) and that "[e]very public utility shall provide service and facilities which are *** adequate, efficient, reliable" (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 8—401). Plaintiffs assert that Bell failed to satisfy its duties pursuant to the foregoing statutes and that its omission gives rise to their claims under section 5—201, which provides:

> "In case any public utility shall do, cause to be done or permit to be done any act, matter or thing prohibited, forbidden or declared to be unlawful, or shall omit to do any act, matter or thing required to be done either by any provisions of this Act

or any rule, regulation, order or decision of the Commission, issued under authority of this Act, the public utility shall be liable to the persons or corporations affected thereby for all loss, damages or injury caused thereby or resulting therefrom, and if the court shall find that the act or omission was wilful, the court may in addition to the actual damages, award damages for the sake of example and by the way of punishment." Ill. Rev. Stat. 1987, ch. 111⅔, par. 5—201.

Plaintiffs assert that, in providing a statutory remedy, the legislature has precluded the use of the *Moorman* doctrine barring tort claims for economic losses. Plaintiffs maintain that no court in Illinois has applied the *Moorman* doctrine to claims arising from statutory liability, although several courts have addressed *Moorman's* applicability to the Uniform Commercial Code (Ill. Rev. Stat. 1987, ch. 26, par. 1—101 *et seq.*), the Contribution Act (Ill. Rev. Stat. 1987, ch. 70, par. 301 *et seq.*), and the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1987, ch. 121½, par. 261 *et seq.*). See *Cirilo's, Inc. v. Gleeson, Sklar & Sawyers* (1987), 154 Ill. App. 3d 494, 507 N.E.2d 81; *Warren v. LeMay* (1986), 142 Ill. App. 3d 550, 491 N.E.2d 464.

In *Warren*, plaintiff home purchasers brought a claim against a real estate broker and an exterminator under the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) for misrepresentation and nondisclosure with respect to termite infestation. The applicable statute provided a remedy for fraud, prohibiting the "use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely on the concealment, suppression or omission," and permitted a private damages action for violations of the statute. (Ill. Rev. Stat. 1981, ch. 121½, pars. 262, 270a.) The *Warren* defendants attempted to apply the *Moorman* doctrine to bar purely economic damages in a tort claim. The court, however, refused to apply *Moorman*, reasoning that

> "*Moorman* dealt with damages compensable under common law principles of negligence, misrepresentation and strict liability. Here, by contrast, defendant *** was found liable for violation of a statute which specifically authorizes the award of actual damages ***. In view of this express statutory authorization, the availability of a remedy for actual damages to plaintiffs is beyond doubt." *Warren*, 142 Ill. App. 3d at 579.

In *Cirilo's*, the third-party defendant argued that *Moorman* supported his claim that he was not jointly subject to liability in tort pur-

suant to the Contribution Act because he could be liable to the original plaintiff only for economic losses. The *Cirilo's* court found the third-party defendant's reliance on *Moorman* to be misplaced because "*Moorman* did not adjudicate a contribution claim, nor does it purport to define 'liability in tort' for Contribution Act purposes; it speaks only to the initial plaintiff-defendant relationship." *Cirilo's*, 154 Ill. App. 3d at 497.

Although Bell acknowledges that no court has held that *Moorman* defeats a statutory cause of action, it nevertheless contends that the Act's liability provisions are in derogation of the common law and, thus, common law principles, including *Moorman* apply. See *Barthel v. Illinois Central Gulf R.R. Co.* (1978), 74 Ill. 2d 213, 384 N.E.2d 323.

In *Barthel*, the plaintiffs sued for personal injuries and wrongful death resulting from a collision between a car and one of the defendant's freight trains. The *Barthel* plaintiffs sued under the same provision of the Act as the present plaintiffs, alleging violations by the defendant of various regulations relating to the safety of railroad crossings. The *Barthel* plaintiffs made the same argument made by plaintiffs here: that section 5—201's provision that a utility violating the Act "shall be liable" for "all" damages was conclusive as to whether a common law doctrine, in *Barthel*, contributory negligence, could preclude damages.

The *Barthel* court found that the Act is in derogation of the common law and thus tort principles limiting a plaintiff's claims under the Act will not be abrogated unless "it plainly appears that the intent of the statute" is to do so. (*Barthel*, 74 Ill. 2d at 221.) The *Barthel* court further found that "statutes in derogation of the common law are to be strictly construed in favor of persons sought to be subjected to their operation. The courts will read nothing into such statutes by intendment or implication." (*Barthel*, 74 Ill. 2d at 220.) Thus, the court held that the common law defense of contributory negligence would bar recovery, despite the Act's provision of liability for "all *** damages" resulting from a violation of the Act. *Barthel*, 74 Ill. 2d at 224.

■ In the instant case, it does indeed appear that section 5—201, which allows recovery for "all" damages, is incompatible with *Moorman's* common law tort principles, which do not allow recovery for economic damages in tort actions. (Compare Ill. Rev. Stat. 1987, ch. 111²/₃, par. 5—201, with *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 435 N.E.2d 443.) However, despite the apparent incompatibility, courts will not abrogate common law tort principles unless statutes "plainly" evidence legislative intent to do

so. (*Barthel*, 74 Ill. 2d at 221.) It does not appear from the language of the Act that the legislature intended to abrogate the common law doctrines of *Moorman* and, thus, plaintiffs should not escape the doctrine prohibiting recovery for economic losses in tort actions simply because they assert their claims pursuant to the Act.

While it is true that section 5—201 imposes liability for all loss resulting from a utility's violation of the Act and that common law doctrines do not allow recovery for all loss, the Act must be "strictly construed" in favor of Bell. (*Barthel*, 74 Ill. 2d at 221.) The legislature did not "plainly" evidence its intent to dispose of common law principles. (See *Barthel*, 74 Ill. 2d at 221.) The *Moorman* doctrine is no less compatible with the Act than is the defense of contributory negligence; yet, the supreme court in *Barthel* held that violations of the Act imposed liability not for "all" loss, but just for those losses for which the plaintiff was not contributorily negligent.

Although plaintiffs argue that *Warren* and *Cirilo's* preclude the application of the *Moorman* doctrine to limit recovery, both cases are consistent with such an application. The Consumer Fraud Act was designed to provide remedies for damages to expectation interests in the context of fraudulent business practices. (See *Warren*, 142 Ill. App. 3d 550; Ill. Rev. Stat. 1981, ch. 121½, par. 261 *et seq.*) *Moorman*'s inapplicability to the Consumer Fraud Act is consistent with the Act's purposes. Further, the Contribution Act focuses on the relationship between the parties and the third-party defendant; it does not address the initial plaintiff-defendant relationship, as does *Moorman. Cirilo's*, 154 Ill. App. 3d 494, 507 N.E.2d 81.

We conclude that *Moorman* is not rendered inapplicable merely because plaintiffs assert a statutory cause of action. Plaintiffs essentially seek damages because their economic affairs were disrupted. These types of damages are plainly not recoverable in tort; similarly, they should not be recoverable pursuant to the Act. See *Barthel*, 74 Ill. 2d 213, 384 N.E.2d 323.

We note that the Illinois Supreme Court has recently addressed *Moorman*'s applicability to the rendering of legal services. (*Collins v. Reynard* (1992), 154 Ill. 2d 48.) We are aware, however, that the supreme court has granted rehearing in *Collins* and we expect that, at the very most, the court might determine that *Moorman* is not applicable to legal malpractice claims.

■ In the alternative, plaintiffs argue that, if *Moorman* does apply, the sudden and dangerous occurrence exception allows their claims. *Board of Education v. A, C & S, Inc.* (1989), 131 Ill. 2d 428,

546 N.E.2d 580 (*Moorman* doctrine does not apply where damage to the defective product was due to a sudden and dangerous occurrence).

In response, Bell correctly asserts that any sudden and dangerous occurrence resulted in damage to its facility and not to plaintiffs' property. Rather, it was only plaintiffs' expectations of service which were affected due to the damage to Bell's equipment. See also *American Drug Stores, Inc. v. A T & T Technologies, Inc.* (1991), 222 Ill. App. 3d 153, 583 N.E.2d 694.

Based on the foregoing, we find that the *Moorman* doctrine prohibits plaintiffs' claims for purely economic losses and, further, that Bell's tariff, which excludes recovery for expectation damages due to interruptions in service, bars plaintiffs' claims.

Affirmed.

McCORMICK, J., concurs.

JUSTICE SCARIANO, dissenting:

I most respectfully dissent.

Plaintiffs who live and/or have businesses or practice their profession in an area for which Bell is capable of processing up to 3½ million telephone calls per day, charge in counts I and II of their complaint that Bell violated several provisions of the Public Utilities Act (PUA) (Ill. Rev. Stat. 1987, ch. 111⅔, par. 5—201) and certain Illinois Commerce Commission rules which resulted in a fire that totally destroyed the Hinsdale switching station and left plaintiffs without telephone service for one full month. Count II further alleges that these violations were wilful, for which the statute explicitly provides a remedy. Count V seeks a declaratory judgment that Bell's tariff does not bar plaintiffs' claims.

The trial court dismissed counts I and II for failure to state a cause of action, and granted Bell summary judgment on count V. Accordingly, we must determine as a pure matter of law whether Bell's tariff bars its liability for wilful violations of the PUA, and whether the doctrine enunciated in *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 435 N.E.2d 443, applies to private causes of action brought under the PUA.

The majority's holding that Bell's tariff does indeed bar its liability for the wilful and wanton wrongs it inflicts upon consumers directly contravenes the clear and express provisions of section 5—201 of the PUA which make Bell liable to plaintiffs for "*all loss [or] damages*," caused by Bell's violation of the PUA; and if the violation is

wilful, "the court may in addition to the actual damages, award damages for the sake of example and by way of punishment." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 111⅔, par. 5—201.) The majority holds, for all intents and purposes, that a unilateral, ministerial act of a public utility, *i.e.*, the filing of a tariff, in combination with the passivity of the Commerce Commission, is all that is needed in Illinois in order for the regulated to become the regulators! We are accordingly treated to the unprecedented and inexplicable phenomenon of having a plain and unambiguous legislative enactment nullified by Bell's tariff and the inscrutable administrative procedures of the Illinois Commerce Commission. And while Bell and the majority insist on labeling the provision in Bell's tariff a "limitation" of its liability, it is impossible to regard it as anything but a complete bar, given that the "foregoing" of a charge for services not rendered can hardly be deemed a "limitation of liability" in any sense of the term. I note that the trial court also came to that conclusion.

The majority claims to find support in a statement contained in the case of *Waters v. Pacific Telephone Co.* (1974), 12 Cal. 3d 1, 7, 523 P.2d 1161, 1164, 114 Cal. Rptr. 753, 756, in which the California Supreme Court, with all of the aplomb of the majority in this case, adopted the utility's "limitation" of liability canard. Yet, neither *Waters*, nor the majority in the case at bar enlightens us in any way as to how or why mere administrative inaction, or action, for that matter, can overcome the plain meaning of a statute.

Moreover, neither *Sarelas* nor *Meyer* is relevant to the issue involved in this case, namely, whether Bell can unilaterally exculpate itself from liability for its wilful misconduct committed in violation of the clear and unambiguous provisions of section 5—201 of the PUA.

The majority's reliance on *Pielet Brothers, Red Lion Broadcasting* and *Hendricks County* is especially inapt inasmuch as the opinions in all three cases recognize that courts give deference to an interpretation of a statute by the agency charged with its administration and enforcement *only if the statute is ambiguous*, which is emphatically not the case here. I respectfully submit that the majority here simply suffers from an incredible blind spot that prevents it from acknowledging that section 5—201 is not an ambiguous law. Our supreme court has consistently held that although "the construction placed on a statute by a departmental agency is entitled to great weight in determining its validity or invalidity[,] *** courts must not be deprived of their judicial functions, nor can we allow a governmental agency to extend the operation of a statute by administrative regulation." (*P.H. Mallen Co. v. Department of Finance* (1939), 372 Ill. 598, 601. Accord

*Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n* (1983), 95 Ill. 2d 142, 153-54; *Ruby Chevrolet, Inc. v. Department of Revenue* (1955), 6 Ill. 2d 147, 151 ("A statute which is being administered may not be altered or added to by the exercise of a power to make regulations thereunder").) And if Federal law is wanted, I refer the majority to *United States v. Cartwright* (1973), 411 U.S. 546, 550, 36 L. Ed. 2d 528, 533, 93 S. Ct. 1713, 1716, where it is held that administrative agency pronouncements are not binding on the courts, as the deference accorded an agency's interpretation of a statute does not displace judicial analysis.

The majority also holds that the *Moorman* doctrine bars plaintiffs' claims, noting that *"Moorman* is not rendered inapplicable merely because plaintiffs assert a statutory cause of action." (234 Ill. App. 3d at 468.) Yet the legislative intent underlying section 5—201 of the PUA is *explicitly* to allow recovery for *"all loss, damages or injury"* caused by any wrongful act or omission on the part of a public utility. (Emphasis added.) It would be difficult to imagine how a statute could be made any clearer.

> "The primary rule in the interpretation and construction of statutes is that the intention of the legislature should be ascertained and given effect. [Citation.] The legislative intent should be sought primarily from the language used in the statute. *Where the language of the act is certain and unambiguous the only legitimate function of the courts is to enforce the law as enacted by the legislature.* [Citations.] *It is never proper for a court to depart from plain language by reading into a statute exceptions, limitations or conditions which conflict with the clearly expressed legislative intent.* [Citations.]" (Emphasis added.) *(Certain Taxpayers v. Sheahen* (1970), 45 Ill. 2d 75, 84.)

"Although Bell acknowledges that no court has held that *Moorman* defeats a statutory cause of action, it nevertheless contends that the Act's liability provisions are in derogation of the common law and, thus, common law principles, including *Moorman* apply. See *Barthel v. Illinois Central Gulf R.R. Co.* (1978), 74 Ill. 2d 213, 384 N.E.2d 323." 234 Ill. App. 3d at 467.

After a discussion of *Barthel,* and in reliance on it, the majority states, "While it is true that section 5—201 imposes liability for all loss resulting from a utility's violation of the Act and that common law doctrines do not allow recovery for all loss, the Act must be 'strictly construed' in favor of Bell. *(Barthel,* 74 Ill. 2d at 221.) The legislature did not 'plainly' evidence its intent to dispose of common law principles. (See *Barthel,* 74 Ill. 2d at 221.)" (234 Ill. App. 3d at

468.) The *Barthel* court held that since section 5—201 of the PUA was in derogation of the common law, "tort principles limiting a plaintiff's claims under the act will not be abrogated unless 'it plainly appears that the intent of the statute' is to do so." 234 Ill. App. 3d at 467, quoting *Barthel*, 74 Ill. 2d at 221.

I have not the organs to perceive that existing law requires the conclusion that the majority reaches in this case: that section 5—201 of the PUA and *Moorman* combine to confer on Bell the immunity we accord only to the sovereign; for immunity is incontestably the result when our courts, in effect, refuse to entertain an action created by the legislature and relegate the plaintiffs to seeking their relief in contract, but the "remedy" in contract turns out to be an illusory one, because here the damages, as we have seen, are "limited" to no damages at all as a consequence of Bell's nullification of section 5—201 which is quaintly nestled in a "tariff." Shades of the regulated becoming the regulators!

Moreover, when we consider that deterrence is indisputably an essential element of our law, whether it be tort or contract, we may very well be entitled to wonder how it is fostered or advanced by the holding of the majority. In an article published in The New York Times of February 13, 1992, under the caption of "Businesses Criticize FCC on Phone Service Disruptions," it is reported that in the third quarter alone of 1991, there were 204 "significant switching failures" (the type of occurrence complained of by plaintiffs in this case) on the part of seven "Baby Bells," including the parent company of Illinois Bell, the defendant herein. The article also points out that business groups complain that our regulatory agencies are "failing to protect the reliability of the nation's telephone networks." The source of the information was given as the Federal Communications Commission.

Bell argues, however, that to hold it liable in negligence would result in damages that could be only speculative, or unknown and unlimited in scope, and grossly disproportionate to its fault. Yet, it cannot be successfully contended that the legislature naturalized section 5—201 into the PUA merely as a sterile attempt at lawmaking. Surely, the General Assembly must be conclusively presumed (*Certain Taxpayers*, 45 Ill. 2d 75) to mean what they so plainly stated in that provision, which the majority sets forth in full in its opinion; nor can we assume that the legislature was oblivious to the prospect that the damages which could result from the remedy it was affording to the customers of public utilities could be considerable. Thus, the General Assembly made actionable *all* acts of commission or omission result-

ing in a violation of the PUA or of the rules, regulations, orders or decisions of the Illinois Commerce Commission, whether those acts be negligent or wilful, and mandated that recovery be made available "for *all* loss, damages or injury caused thereby or resulting therefrom" (emphasis added), including punitive damages.

Moreover, our supreme court on more than one occasion has found it necessary to remind defendants who advance the argument made by Bell here that, "it is not the privilege of him whose wrongful act caused the loss to hide behind the uncertainties inherent in the very situation his wrong has created." (*Elliott v. Willis* (1982), 92 Ill. 2d 530, 540-41, citing *Smith v. City of Detroit* (1972), 388 Mich. 637, 202 N.W.2d 300.) And in *Zostautas v. St. Anthony De Padua Hospital* (1961), 23 Ill. 2d 326, 334-35, the court recalled the words of that venerable jurist, Benjamin Cardozo, in *Van Beeck v. Sabine Towing Co.* (1937), 300 U.S. 342, 350-51, 81 L. Ed. 685, 690, 57 S. Ct. 452, 456, that "[i]t would be a misfortune if a narrow or grudging process of construction were to exemplify and perpetuate the very evils to be remedied." At the very least, Bell ought not to be heard to complain about the difficulties of plaintiffs' proof, for it is their burden, and not Bell's, to establish the existence and extent of their damages. Besides, this case is before this court, as it was before the trial court, on motions which concede the well-pleaded fact of damages. Nor should we lose sight of the fact that it is still traditional in our law that after hearing any contrary evidence and weighing the facts, the trier of fact bears the ultimate responsibility of deciding whether to award damages.

I would reverse the judgment of the circuit court. At the very least, I would expect that we attend the result in *Collins v. Reynard* (1992), 154 Ill. 2d 48, presently pending on rehearing in the Illinois Supreme Court. I decline to join the majority in its prognostications as to what the court "might determine" in *Collins*; there are rigors enough in applying *Moorman* in its present state. It has not been brought to my attention that the science of hermeneutics has been extended to apply to what has yet to be revealed.

Accordingly, I dissent.