NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11741


MARYLAND CASUALTY COMPANY[1] & another[2] vs.  NSTAR ELECTRIC
COMPANY & another.[3]



Middlesex.     January 5, 2015. - May 14, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.



Department of Public Utilities.  Public Utilities, Electric
     company, Rate structure, Negligence.  Negligence, Public
     utilities, Limitation of liability.



     Civil action commenced in the Superior Court Department on
March 27, 2008.

     The case was heard by Dennis J. Curran, J., on motions for
summary judgment, and entry of a stipulated final judgment was
ordered by him.

     The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.

---

[1] As subrogee of Cambridge Incubator, Inc., doing business
as Cambridge Innovation Center, and Sedo.com, LLC.

[2] Assurance Company of America, as subrogee of Allodia
Corporation.

[3] NSTAR Electric and Gas Corporation.

Matthew M. O'Leary (Andrew J. Fay with him) for the plaintiffs.
Andrea Peraner-Sweet (Barbara L. Drury with her) for the defendants.

LENK, J.  This case raises the question whether a tariff filed with and approved by the Department of Public Utilities (DPU) may limit a public utility from liability to nonresidential customers for special, indirect, or consequential damages resulting from the utility's gross negligence.  We hold that a properly approved tariff may so limit a public utility's liability.

1.  Background.  On December 8, 2006, two employees of NSTAR Electric and Gas were performing a switching procedure to restore electrical equipment that had been taken out of service. During the procedure, an explosion occurred, igniting a fire in the basement of a building at One Broadway in Cambridge.  Smoke filled the basement and flowed into the stairwells leading up to the other floors of the building.  The fire and smoke resulted in extensive damage to the building, requiring its closure for approximately six weeks.  Construction and repairs continued for a lengthy period of time thereafter.

At the time of the fire, the building was owned by the Massachusetts Institute of Technology (MIT).  MIT leased space

in the building to Cambridge Incubator, Inc. (Cambridge Incubator),[4] Sedo.com, LLC (Sedo), and Allodia Corporation (Allodia). Cambridge Incubator and Sedo purchased insurance coverage from Maryland Casualty Corporation (Maryland Casualty); Allodia purchased insurance coverage from Assurance Company of America (Assurance). In the wake of the fire, Maryland Casualty paid claims by Cambridge Incubator and Sedo, and Assurance paid claims by Allodia.

Maryland Casualty and Assurance then brought this complaint against NSTAR Electric Company and NSTAR Electric & Gas Company (collectively, NSTAR), seeking to recover for the claims paid to Cambridge Incubator, Sedo, and Allodia. The plaintiffs asserted causes of action in negligence, gross negligence or reckless, wilful and wanton misconduct, breach of contract, and breach of express and implied warranties. They alleged that the explosion resulted from NSTAR's inadequate maintenance of its equipment at the building and training of the crew performing the switching procedure.

NSTAR moved for partial summary judgment. It contended that, to the extent to which the insurers sought recovery for business interruption losses, their claims were barred as a

---

[4] Doing business as Cambridge Innovation Center.

matter of law by Massachusetts Department of Telecommunications and Energy Tariff No. 200A (tariff), filed with and approved by the DPU on January 31, 2006, and in effect when the explosion occurred in December, 2006. The tariff contained a "Limitation of Liability" clause providing that, "for non-residential Customers served under general service rates, the Company shall not be liable in contract, in tort (including negligence and [G. L. c.] 93A), strict liability or otherwise for any special, indirect, or consequential damages . . . ."

A judge of the Superior Court allowed, in part, NSTAR's motion for summary judgment. The judge determined that, while private parties may not contractually limit their liability for gross negligence, a tariff filed with and approved by a regulatory agency may so limit a public utility's liability. Because the claims paid to Allodia and Sedo that the plaintiffs sought to recover were exclusively for business interruption, the judge determined that they were fully precluded by the "Limitation of Liability" clause. By contrast, the judge concluded that, to the extent Maryland Casualty sought to recover for claims paid to Cambridge Incubator for property damage, its claims were not for "special, indirect or consequential damages," and thus were not barred by the tariff.

     In the wake of the judge's decision, the parties filed a stipulated judgment awarding Maryland Casualty the amount of $17,062 plus interest for claims paid to Cambridge Incubator for property damage.  The plaintiffs then appealed from the decision granting partial summary judgment, and we transferred the case to this court on our own motion.

     2.  Discussion.  On appeal, the plaintiffs assert that the judge improperly granted partial summary judgment because: (1) there is a genuine dispute regarding the authenticity of the tariff; (2) the language at issue in the tariff does not clearly and unambiguously preclude liability for claims based on gross negligence or wilful and wanton misconduct; and (3) NSTAR cannot limit its liability for losses caused by its own gross negligence or wilful and wanton misconduct.[5]  We conclude that the tariff is authentic, that the clause at issue does encompass claims based on gross negligence or wilful and wanton

_____

     [5] The plaintiffs also assert that there is a genuine dispute regarding whether the losses sought by plaintiffs were caused by NSTAR's gross negligence or wilful and wanton misconduct.  We agree with NSTAR that this argument is not properly before the court.  The judge never addressed whether there is a genuine dispute of material fact regarding NSTAR's alleged gross negligence or wilful and wanton misconduct.  Instead, the judge determined that, even if the plaintiffs could show gross negligence, their claims would be barred as a matter of law by the "Limitation of Liability" clause.

misconduct, and that the clause is enforceable.[6]

a. Authenticity of the tariff. General Laws c. 25, § 1, provides that the DPU "shall have an official seal, which shall be judicially noticed." The judge based his decision granting summary judgment on the copy of the tariff submitted to the Superior Court by NSTAR and accompanied by a cover letter that contained the DPU's official seal. The cover letter attests that "the attached are true and certified copies of NSTAR Electric Company/Cambridge Electric Company Terms and Conditions for Distribution Services Tariffs . . . on file with the Rates and Revenue Requirements Division of this Agency and also a copy of the Stamp Approval dated January 31, 2006 of the compliance filing . . . ."

The plaintiffs contend that the judge erred in granting summary judgment to NSTAR because there is a genuine and material factual dispute as to the authenticity of the tariff at issue. The plaintiffs' challenge to the tariff's authenticity focuses on discrepancies between the copy of the tariff that accompanied NSTAR's motion for summary judgment and the copy of

_____

[6] Because we conclude that the "Limitations of Liability" clause precludes all of plaintiffs' claims, we do not address NSTAR's alternative argument that, regardless of the clause, the claims of Sedo and Allodia are barred by the economic loss doctrine.

the tariff later submitted to the court with the cover letter from the DPU. We conclude that these alleged discrepancies, which involve minor differences in the pagination of the documents, do not give rise to a "genuine issue" regarding the authenticity of the tariff accompanied by the DPU's official seal. See DIRECTV, LLC v. Department of Revenue, 470 Mass. 647, 657-658 (2015), citing HipSaver, Inc. v. Kiel, 464 Mass. 517, 522 (2013) (no genuine issue of material fact where party has "no reasonable expectation" of prevailing on factual dispute). See also Mass. R. Civ. P. 56(c), as amended, 436 Mass. 1404 (2002).

  b.  Interpretation of the "Limitation of Liability" clause. The tariff's "Limitation of Liability" clause provides, in full:

> "Unless there is negligence on the part of the Company, the Company shall not be liable for damage to the person or property of the Customer or any other persons resulting from the use of electricity or the presence of the Company's appliances and equipment on the Customer's premises. In any event, for non-residential Customers served under general service rates, the Company shall not be liable in contract, in tort (including negligence and [G. L. c.] 93A), strict liability or otherwise for any special, indirect, or consequential damages whatsoever including, but not limited to, loss of profits or revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime, business interruption, spoilage of goods, claims of Customers of the Customer or other economic harm."

This court has observed that, "where words in a tariff are

used in a peculiar or technical sense, and where extrinsic evidence is necessary to determine their meaning or proper application, so that 'the enquiry is essentially one of fact and of discretion in technical matters,' then the issue of tariff application must first go to the [regulatory] [c]ommission." Spence v. Boston Edison Co., 390 Mass. 604, 613 (1983), quoting United States v. Western Pac. R.R._, 352 U.S. 59, 66 (1956). The interpretive question at issue in this case, however, does not turn on any technical term. Instead, it concerns the meaning and scope of a tariff provision specifying the types of damages for which NSTAR may be held liable. Because the interpretation of such a provision poses a pure question of law, it is proper for judicial resolution. See Patterson v. Christ Church in the City of Boston, 85 Mass. App. Ct. 157, 159 (2014).

We have little difficulty concluding that the portion of the "Limitation of Liability" clause at issue here encompasses a claim of gross negligence or wilful and wanton misconduct. The clause refers to liability "in tort." A cause of action for gross negligence or wilful and wanton misconduct is a form of liability "in tort." MacFadyen v. Maki, 70 Mass. App. Ct. 618, 621-623 (2007); 1 D.B. Dobbs, P.T. Hayden, & E. M. Bublick, Torts § 140 (2d ed. 2011); Restatement (Second) of Torts § 500

(1965).

The plaintiffs assert that the clause's parenthetical phrase -- "(including negligence and [G. L. c.] 93A)" -- indicates that "[t]he only 'tort' liability [the clause] purports to limit is that for 'negligence and [G. L. c.] 93A.'" "It is," however, "hornbook law that the use of the word 'including' indicates that the specified list . . . that follows is illustrative, not exclusive." Puerto Rico Maritime Shipping Auth. v. Interstate Commerce Comm'n, 645 F.2d 1102, 1112 n.26 (D.C. Cir. 1981). The tariff's "use of the word 'including' indicates that the [parenthetical] list is representative, not all-inclusive, and that any . . . tort is covered" by the clause. See Barrows v. Wareham Fire Dist., 82 Mass. App. Ct. 623, 626 (2012).

In context, the specific reference to "negligence" in the parenthetical serves to clarify the relation between the "Limitation of Liability" clause's first and second sentences. The first sentence indicates that the public utility shall not be held liable to any customers "[u]nless there is negligence on the part of the Company." The second sentence indicates that, "[i]n any event," the utility shall not be liable "in tort (including negligence . . .)" to "non-residential Customers

served under general service rates . . . for any special, indirect, or consequential damages whatsoever."  The clause's specific reference to liability for "negligence," then, elucidates the relation between the "no liability to any customers without negligence" rule established in the first sentence and the "no liability to nonresidential customers served under general service rates for special, indirect or consequential damages" rule articulated in the second sentence. It does not render the latter rule ambiguous.

Indeed, the intention to exempt the company from all liability to nonresidential customers served under general service rates for special, indirect, or consequential damages is abundantly clear from the tariff.  The tariff's list of the potential bases for liability is followed by the phrase "or otherwise," thereby sweeping up any other potential bases of liability not encompassed in the already broad categories of liability specifically listed.  Further, the tariff's reference to "special, indirect, or consequential damages" is sandwiched between the words "any" and "whatsoever."  Finally, the tariff's illustrative list of potential forms of "special, indirect, or consequential damages" is preceded by the phrase "including, but not limited to."

Short of a specific reference to gross negligence or wilful and wanton misconduct, it is difficult to imagine how the tariff more plainly could have exempted the plaintiffs from liability for "special, indirect, or consequential damages."  Because such a specific reference is not required, and the plaintiffs do not contest that they are nonresidential customers served under general service rates or that they are seeking to recover special, indirect, or consequential damages, the rule articulated in the second sentence encompasses the plaintiffs' claims.

c.  Enforceability of the limitation of liability clause. In Massachusetts, a public utility's "liability for damages may be limited by properly filed and approved tariffs."  Disk 'N' Data, Inc. v. AT&T Communications, 415 Mass. 886, 888 (1993). Such tariffs "have the 'force and effect of law,'" id., so long as they satisfy the basic "requirement of reasonableness," Wilkinson v. New England Tel. & Tel. Co., 327 Mass. 132, 135 (1951) (Wilkinson).

The core of the plaintiffs' argument is that, while a public utility may, through its tariff, limit its liability for ordinary negligence, it may not limit its liability for gross negligence or wilful and wanton misconduct.  In making that

argument, the plaintiffs invoke the well-established principle of contract law indicating that, "while a party may contract against liability for harm caused by its negligence, it may not do so with respect to its gross negligence." Zavras v. Capeway Rovers Motorcycle Club, Inc., 44 Mass. App. Ct. 17, 19 (1997). See CSX Transp., Inc. v. Massachusetts Bay Transp. Auth., 697 F. Supp. 2d 213, 226 (D. Mass. 2010) ("the [Supreme Judicial Court] would not enforce agreements purporting to require indemnification against gross negligence"). We conclude that the plaintiffs' invocation of that principle of contract law is inapposite in light of the distinction between a contractual release of liability and a properly filed and approved public utility tariff.

The plaintiffs' argument relies primarily on one, nearly one and one-half century old precedent, Ellis v. American Tel. Co., 13 Allen 226 (1866) (Ellis). In that case, a plaintiff sued a telegraph company for damages resulting from a missent telegraph. Id. at 227. This court determined that the statutory scheme governing telegraph companies "takes the business of conducting and managing a line of electric telegraph within this [C]ommonwealth out of the class of ordinary private occupations, and makes it a quasi public employment, to be carried on with a

view to the general benefit and for the accommodation of the community." Id. at 231. The court nevertheless deemed enforceable a contractual clause providing that the telegraph company would not be liable for errors and delays in the transmission of messages unless the plaintiff paid extra to have the message in question sent back to the station from which it originated. Id. at 236. The court observed that the general rule that a defendant is liable for damages caused by its negligence:

> "does not operate so as to prevent parties from prescribing reasonable rules and regulations for the management of the business, or establishing special stipulations for the performance of service which, if made known to those with whom they deal, and directly or by implication assented to by them, will operate to abridge their general liability at common law, and to protect them from being held responsible for unusual or peculiar hazards which are incident to particular kinds of business. Of course, a party cannot in such way protect himself against the consequences of his own fraud or gross negligence, or the fraud or gross negligence of his servants or agents."

Id. at 234.

In Wilkinson, 327 Mass. at 135, the court cited Ellis, supra, in the context of claims against a telephone company for financial loss caused by the defendant's failure of service. The court affirmed a directed verdict in favor of the defendant telephone company, based on a limitation of liability clause in the rate schedule and accompanying regulations. Wilkinson,

supra at 134. The court observed, in dicta, that "[o]ne of the counts in the plaintiff's declaration alleges wilful and wanton acts of the defendant and, if sustained by evidence, might require submission of this action to the jury." Id. at 135. The court concluded, however, that the plaintiff could not recover on that count because "[n]owhere in the opening statement . . . [was] there a sufficient allegation of facts from which the jury could infer or find any wilful or wanton misconduct on the part of the defendant." Id.

In our view, both the Wilkinson court's citation to Ellis and the plaintiffs' reliance on Ellis elide the significant historical transformation in the regulation of public utilities that occurred after 1866, when Ellis was decided. The Ellis court determined that the statutory scheme governing the telegraph industry transformed it into "a quasi public employment," even though the statutory scheme did not confer on telegraph companies all the duties and obligations that apply to common carriers. Ellis, 13 Allen at 231. The court nevertheless concluded that the statutory scheme "recognized and affirmed" a telegraph company's right, under "familiar and well settled principles of common law," to "make rules and regulations by which to define and limit their duties and

obligations in the transaction of the business which they assume to carry on." Id. at 235.

The limitation of liability clause at issue in Ellis, then, was contractual. Its contractual character, moreover, was crucial to the court's decision. The court observed that the plaintiff "had notice" of the term limiting the telegraph company's liability. Id. at 237. Although the plaintiff, as the intended recipient rather than the sender of the missent message, "entered into no express contract with the defendants," the court concluded the plaintiff's power to recover was limited by the terms of the contract entered into between the sender and the telegraph company. Id. As the court explained, "it is difficult to see how the plaintiff, who claims through the contract entered into by the sender of the message with the defendants, which created the duty and obligation resting on the defendants, can claim any higher or different degree of diligence than that which was stipulated for the parties to the contract." Id. at 238.

In the late Nineteenth Century, this contract-based approach gave way to the now dominant tariff-based model for public utilities regulation. See Kearney & Merrill, The Great Transformation of Regulated Industries Law, 98 Colum. L. Rev.

1323, 1331-1332 (1998) (Kearney & Merrill). Under that model, the "progenitor" of which was the 1887 Interstate Commerce Act (ICA), a public utility is required to file a tariff, which contains all rates and all regulations, practices, or classifications affecting those rates. See Kearney & Merrill, supra at 1331. Once the tariff is approved by the relevant regulatory agency, any deviation from it is strictly prohibited. Id. With respect to telegraphs (the industry at issue in Ellis), the United States Supreme Court observed in Western Union Tel. Co. v. Priester, 276 U.S. 252, 259 (1928), that, as a result of amendments to the ICA bringing the telegraph industry into the tariff-based model of public utility regulation, "[w]hat had previously been a matter of common law liability, with such contractual restrictions as the [S]tates might permit, then became the subject of [F]ederal legislation to secure reasonable and just rates for all without undue preference or advantage to any."

Wilkinson, decided eighty-five years after Ellis, manifests the transformation in public utility regulation. Whereas in Ellis telegraph companies operating in the Commonwealth were "only required to transmit despatches 'according to the regulations' which they may establish," Ellis, 13 Allen at 235,

in Wilkinson the defendant telephone company's "rates, regulations, and practices [were] subject to the control and supervision of the [DPU]." Wilkinson, supra at 133. The DPU's ultimate control over the rates, regulations, and practices governing the provision of telephone service, moreover, was crucial to the court's analysis of the case. In affirming the grant of a directed verdict, the court observed that "rates and regulations are indissolubly bound together" such that, "[w]hen the [DPU] approved [the] regulation [at issue], it must have had in mind its effect on rates and no modification of the regulation may be countenanced." Id. at 136.

We likewise have observed that "the extensive legislative regulation of [an electric company's] rates and practices takes the furnishing of electricity out of the realm of contract law." FMR Corp. v. Boston Edison Co., 415 Mass. 393, 396 (1993). Instead, "[t]he process of utility rate making by a public regulatory body is the exercise of a legislative function, . . . which has been delegated to the [DPU] through the enactment of G. L. c. 164" (citation omitted). Boston Edison Co. v. Boston, 390 Mass. 772, 774 (1984). The result of that process is a "quasi statutory enactment." Id. at 777, quoting Haverhill Gas Co. v. Findlen, 357 Mass. 417, 420 (1970).

In light of this distinction, we are persuaded that the contract rule against releases for gross negligence or wilful and wanton misconduct should not be applied in the tariff context. Several considerations lead us to that conclusion.

First, tariffs differ from contracts in that the regulatory process by which the rates are set provides recourse for the public to challenge rates or tariff terms as onerous or unfair. Courts in the Commonwealth have been particularly "cautious in enforcing releases against liability," and have "decline[d] to do so" in circumstances "where a public utility attempts to limit its liability." Zavras v. Capeway Rovers Motorcycle Club, Inc., 44 Mass. App. Ct. 17, 19 (1997). See Sharon v. Newton, 437 Mass. 99, 106 (2002) ("We have not had occasion to rule on the validity of releases required in the context of a compelled activity or as a condition for the receipt of essential services [e.g., public education, medical attention, housing, public utilities], and the enforceability of mandatory releases in such circumstances might well offend public policy"). Such heightened scrutiny makes sense in the context of contractual releases, given that public utilities typically enjoy "legislatively sanctioned monopol[ies]" for the provision of essential services, Boston Edison Co. v. Boston, 390 Mass. at

777, obviating the possibility of true bargaining between a utility and its customers.

In the context of a public utility tariff, however, the regulatory regime provides a framework for protecting against onerous or unfair limitations in liability.  Pursuant to G. L. c. 164, § 94, for instance, electric companies operating within the Commonwealth must file with the DPU "schedules . . . showing all rates, prices and charges to be charged or collected within the [C]ommonwealth for the sale and distribution of . . . electricity, together with all forms of contracts to be used in connection with such schedules."  Before an electric company may change its rates, the DPU must "hold a public hearing and make an investigation as to the propriety of such proposed changes." Id.  The DPU may initiate an investigation, either upon complaint or on its own motion, into a proposed rate change. Id.  Furthermore, "all contracts for the sale of . . . electricity by . . . electric companies . . . shall be filed with the [DPU]," and the "[DPU] may investigate the propriety of any such contract, both before and after such contract has become effective, and may, after notice and a public hearing, make such orders relative to the rates, prices, charges and practices covered by such contract as the public interest

requires."  Id.

Second, because the tariff that results from this process is "not . . . a matter of contract by which a legal liability could be modified, but a matter of law by which a uniform liability was imposed," see Western Union Tel. Co. v. Esteve Bros. & Co., 256 U.S. 566, 572 (1921), it demands a degree of judicial deference not warranted in the contractual context. The statutory scheme indicates that "[t]he Legislature delegated the responsibility for regulating [electric] company practices to the DPU."  Lebowitz Jewelers Ltd. v. New England Tel. & Tel. Co., 24 Mass. App. Ct. 268, 273 (1987).  To evaluate and invalidate that "Limitation of Liability" clause based on traditional contract law principles would entail the court impermissibly "substitut[ing] its judgment for that of the Legislature."  Id., quoting Purity Supreme, Inc. v. Attorney Gen., 380 Mass. 762, 776 (1980).

Finally, a judicial decision invalidating the "Limitation of Liability" clause would have effects beyond the clause itself.  "The limitation of liability was an inherent part of the rate" set by the DPU, and "[t]he company could no more depart from it than it could depart from the amount charged for the service rendered."  Western Union Tel. Co. v. Esteve Bros. &

Co., 256 U.S. at 571. Because "the rates as fixed by the [DPU] are established with the rule of limitation in mind," invalidation of the limitation would undermine the broader structure by which both the public utility's "rights and privileges" as well as "its liabilities" are carefully defined and limited. Waters v. Pacific Tel. Co., 12 Cal. 3d 1, 7 (1974).

The fact that the plaintiffs here allege gross negligence or wilful and wanton misconduct does not alter the analysis. In a classic formulation, this court described the distinctions between ordinary negligence, gross negligence, and wilful and wanton misconduct as matters of degree. "The element of culpability which characterizes all negligence is in gross negligence magnified to a high degree as compared with that present in ordinary negligence," but is nevertheless "something less than . . . willful, wanton and reckless conduct . . . ." Altman v. Aronson, 231 Mass. 588, 591-592 (1919). Because the tariff provision at issue applies to all claims by nonresidential customers seeking to recover "special, indirect, or consequential damages," without regard to distinctions between the degrees of culpability, we decline to make such a distinction.

Courts in other jurisdictions have reached the same conclusion. Most pertinently, the United States Supreme Court in Western Union Tel. Co. v. Priester, 276 U.S. 252, 259-260 (1928), after concluding that the tariff system took the regulation of the telegraph industry out of the realm of contract law, determined that a plaintiff could not escape a limitation of liability clause in a tariff simply by affixing the "vituperative epithet" of "gross" to an allegation of negligence. "[I]f it be assumed that we can weigh and measure degrees of negligence and that a public service company may not by contract alone limit its liability for gross negligence, so-called," the court observed, "nevertheless we may not disregard a lawful exercise of the regulatory power which has made no distinction between degrees of negligence, nor may we, upon any theory of public policy, annex to the rate as made conditions affecting its uniformity and equality." Id. at 260. Tracking this analysis, courts in other jurisdictions similarly have rejected arguments that an allegation of gross negligence takes a plaintiff's claim out of the scope of a limitation of liability clause. See Stern v. General Tel. Co., 50 Cal. App. 3d 538, 541-542 (1975); Professional Answering Serv., Inc. v. Chesapeake & Potomac Tel. Co., 565 A.2d 55, 65 (D.C. 1989); In

re Illinois Bell Switching Station Litig., 234 Ill. App. 3d 457, 463-465 (1992).

We acknowledge that a number of courts in other States have reached a different conclusion, determining that a provision in a tariff exempting a public utility from liability for gross negligence is invalid. Closer examination of the extra-jurisdictional authorities identified by the plaintiffs, however, reveals that many are distinguishable from the instant case. In Satellite Sys., Inc. v. Birch Telecom of Okla., Inc., 51 P.3d 585, 589 (Okla. 2002), for instance, the Oklahoma Supreme Court observed that "[c]ourts overwhelmingly reject attempts to limit liability either by contract or by tariff for gross negligence, willful misconduct, and fraud." There, however, the plaintiff alleged that the defendant engaged in fraud, not gross negligence, and the court held that, "[b]ecause [the] tariff attempted to limit its liability for fraud, it was unreasonable, does not have the force of law, and is not binding." Id. In other decisions cited by the plaintiffs, the tariff specifically provided that, while the utility would not be liable for negligence, it could be held liable for gross negligence. See Pilot Indus. v. Southern Bell Tel. & Tel. Co., 495 F. Supp. 356, 362 (D.S.C. 1979) ("This Court is likewise

convinced that the tariff on file with the South Carolina Public Service Commission and the Federal Communications Commission effectively limits defendant's liability for service interruptions in the absence of its gross negligence or wilful/wanton conduct"); Lee v. Consolidated Edison Co., 98 Misc. 2d 304, 305 (N.Y. Sup. Ct. 1978) (tariff provision "essentially exempts [electric company] from liability for ordinary negligence and renders it liable for gross negligence only").  Because these tariffs did not seek to exempt the defendants from liability for gross negligence, the courts had no occasion to determine whether such an exemption would be valid.

Finally, while we reject a categorical rule that a limitation of liability clause in a tariff must distinguish between ordinary negligence and gross negligence or wilful and wanton misconduct, a tariff provision limiting liability nevertheless must satisfy the basic requirement of reasonableness.  Wilkinson, 327 Mass. at 135; Lebowitz Jewelers Ltd. v. New England Tel. & Tel. Co., 24 Mass. App. Ct. at 270. The plaintiffs, however, only argue that the challenged provision is "unreasonable" insofar as they contend that any tariff provision limiting liability for gross negligence is

unreasonable. We reject that contention, and see no other reason for thinking that the "Limitation of Liability" clause is unreasonable.

The provision does not categorically exempt NSTAR from liability for negligence, much less gross negligence. On the contrary, the provision specifically contemplates liability for negligence, to both residential and nonresidential customers alike. The portion of the "Limitation of Liability" clause that the plaintiffs challenge here merely exempts NSTAR from liability for a particular type of damages ("special, indirect, or consequential damages") asserted by a particular class of customers (nonresidential customers served under general service rates). There are compelling reasons why the DPU could approve of such a limitation, even where it fails to make a distinction between ordinary negligence and gross negligence. As scholars have noted, consequential damages, such as damages for lost profits or business interruption, are at once extremely difficult to predict and potentially immense in magnitude. See, e.g., Tort Recovery for Negligently Inflicted Economic Loss: A Reassessment, 37 Stan. L. Rev. 1513, 1536 (1985).

Under these circumstances, we think that the "Limitation of Liability" clause is reasonable. We have no occasion to address

whether a broader limitation of liability tariff provision -- one that, for instance, fully immunized a public utility from liability for damages resulting from its gross negligence or wilful and wanton misconduct, rather than merely immunizing it from claims for a particular type of damages, or one that encompassed claims for fraud -- would, if it were to survive DPU scrutiny, satisfy the basic requirement of reasonableness.

3. <u>Conclusion</u>. For the reasons stated, we conclude that the limitation of liability clause in the tariff precludes the plaintiffs' claims to recover for business interruption and other consequential or economic damages.

<u>Judgment affirmed</u>.