Kaplan, Mitchell H., J.
In this action, the plaintiff, Raquel Rodriguez, on behalf of herself and all other similarly situated purchasers of monthly commuter rail passes, seeks to recover the economic damages that she alleges she and the putative class suffered when the defendants, Massachusetts Bay Transportation Authority (MBTA) and Keolis Commuter Services, LLC (Keolis), failed to provide “timely and reliable commuter rail service” during a period beginning near the end of January 2015 through March 2015. As anyone living in the MBTA’s service area at that time knows, during those months, the Commonwealth of Massachusetts endured record-breaking snow storms that, at times, paralyzed travel and altered normal patterns of daily life in the region.
Rodriguez’s first amended complaint (complaint) contains the following five claims: breach of contract against the MBTA (Count I), unjust enrichment against the MBTA (Count II), breach of contract against Keolis (Count III), unjust enrichment against Keolis (Count IV), and violation of G.L.c. 93A, §9 against Keolis (Count V). Under all these claims, Rodriguez asserts a right to monetary relief as a consequence of the purchase of monthly commuter rail passes in January, February, and March 2015, at undiscounted rates, because the defendants did not provide commuter rail services on many days during that period, or only provided commuter rail services at drastically reduced schedules.
The case is now before the court on the MBTA’s and Keolis’ motions to dismiss all counts for failure to state claims upon which relief can be granted pursuant to Mass.R.Civ.P. 12(b)(6). On March 3, 2016, the court convened a hearing on the motions. In consideration of the parties’ memoranda of law and oral arguments, for the reasons that follow, the MBTA’s motion to dismiss is ALLOWED and Keolis’ motion to dismiss is ALLOWED.[3]
BACKGROUND
The following facts, assumed to be true, are taken from the complaint and the documents referenced therein.[4] Rodriguez is a resident of Massachusetts who purchased monthly commuter rail passes through her employer in January, February, and March of 2015. The MBTA was created by statute and is charged with providing commuter rail service and subway service. Keolis is a Maryland corporation that transacts business in Massachusetts.
The MBTA is responsible for providing commuter rail service along fourteen rail routes in and around the Boston, Massachusetts area. The MBTA contracted with Keolis to operate, staff, and maintain the commuter rail, which includes the commuter rail’s tracks and equipment. On a typical weekday, the MBTA provides commuter rail service to 131,161 people and to approximately 25,703 people and 20,907 people on Saturdays and Sundays, respectively. Moreover, on a typical weekday, the MBTA provides 62,244 inbound and 62,775 outbound commuter rail passenger rides. There are approximately 388 route miles of service and 138 commuter rail stations.
Each month, the MBTA sells monthly commuter rail passes to thousands of commuter rail passengers based on “zone pricing.” There are ten different zones, and the MBTA offers both commuter rail zone and interzone pricing, essentially offering twenty different monthly zone passes. Pass prices range from $75.00 to $362.00. Thousands of people purchase monthly commuter rail passes each month.
In February 2015, Rodriguez purchased a Zone 1 Pass for $182.00. The commuter rail pass contains the following language: “Subject to applicable tariff regulations and conditions of use. Ticket may be confiscated for misuse. Not replaceable if lost or stolen. Non-refundable.” The pass also provides that schedule and fare information is available at, “617-222-3200 Website: www.mbta.com.”
The MBTA printed its commuter rail tariff, effective July 1, 2014, in the form of a paper booklet.[5] The tariff governed terms of service. Section 6 of the tariff described the following monthly pass and ticket refund policy:
Tickets purchased on board from crew members (rebates) are nonrefundable.
An application for a refund must be made at the location where the ticket was purchased. Refunds will not be provided without a receipt.
Refunds for tickets purchased at Back Bay, North Station, and South Station will be provided as provided below:
Monthly Pass
The amount of refund for a monthly pass is as follows:
100% through the 2nd of the month for which the pass is valid;
50% from the 3rd of the month up to the 9th of the month for which the pass is valid;
25% from the 10th of the month up to the 14th of the month for which the pass is valid;
*420 No refund is available after the 15th of the month for which the pass is valid.
A monthly pass purchased through the Corporate Pass Program may only be exchanged or refunded through their Corporate Administrator.
The winter of 2015 in Massachusetts “featured several winter storms from Januaiy through February 2015.” Complaint at para. 29. There were four snow storms with snow accumulations in the double digits on or about Januaiy 27, February 2, February 7, and February 14 of 2015. It snowed seven inches from February 15 through February 28, 2015 in Boston, and six inches of snow fell in Boston in March of 2015. Rodriguez notes that even though the Boston area received “historic” snow fall for the entire winter of 2015, there were at least three to seven days between each double digit snow storm and “more than enough time to clear the snow and return to a full commuter rail schedule.”[6] Id. at paras. 33-34.
Nonetheless, the MBTA announced the cancellation of all commuter rail, subway, and most bus service from 7:00 p.m., on Monday, February 9, 2015 through all day Tuesday, February 10, 2015. On February 9, 2015, Massachusetts Governor Charlie Baker stated that he was “frustrated” and “disappointed” in the MBTA’s decision to suspend commuter rail and subway service and that the decision was “unacceptable.” In response to Governor Baker’s statement, Dr. Beverly Scott, then the Chief Executive Officer and General Manager of the MBTA, criticized the lack of significant investment in the MBTA and referenced the MBTA’s age (it was not a “spring chicken system”) and aging equipment. On February 11, 2015, Scott resigned from her position at the MBTA and stated that, “much more needs to be done to achieve the modern and first-class public transportation system that all want and deserve.”
At some point in February 2015, the MBTA and/or Keolis announced a “winter recovery schedule” and continued to provide less than full commuter rail and subway service for the rest of February and March of 2015. Each commuter rail line ran four to five trains per day; only one or two trains per line ran in the morning on weekdays. The commuter rail train schedules were inconvenient, trains were cancelled and frequently delayed without proper announcements through the defendants’ “alert system,” and “service was well short of what Plaintiff and monthly purchasers of monthly commuter rail passes paid for.” Complaint at para. 43. Moreover, “(t]he odd, inconvenient and unreliable winter recovery schedule left Plaintiff and purchasers of monthly commuter rail passes largely unable to use their monthly commuter rail passes for the second half of February and most of March 2015, or if used at all with substantial uncertainly and delay.” Id. at para. 44. At some point in February, the MBTA announced that it would not have commuter rail service fully operational until the end of March 2015, well after the last significant winter snow storm.
On March 11, 2015, the MBTA “admitted it failed its ridership” and offered riders a fifteen percent discount to anyone who purchased a May 2015 monthly commuter rail pass. Id. at para. 46. The average discount was approximately $37.74. Rodriguez asserts that the defendants operated the commuter rail at much less than an eighty-five percent service level for almost ten weeks and that a fifteen percent discount for one month “falls well short of a fair refund for Defendants’ breach.” Id. at para. 48.
Rodriguez alleges that years of mismanagement at the MBTA and a culture of indifference (not the weather) are the real reasons that the defendants provided substandard service and “breached the contracts" with her and other purchasers of monthly commuter rail passes. Both the MBTA and Keolis lacked the proper equipment to deal with winter storms. The MBTA failed to spend $2.3 billion of its capital budget over the last five years. However, the MBTA spent $66.5 million on salaries for 444 employees, for an average annual salary of approximately $150,000 per employee, and, according to Rodriguez, the MBTA diverted funds from its capital budget to pay these salaries. Rodriguez also points to a story in the Boston Globe, which reported that the MBTA spent $244 million on forty locomotives that were delivered in an unusable condition. As of January 2015, only two of the forty locomotives were in service. In addition, the MBTA paid a South Korean company $144 million for seventy-five passenger cars that were delivered thirty months late. To make matters worse, the passenger cars were so trouble-prone that many of their parts had to be replaced.
Governor Baker created a special panel to review the MBTA. The panel noted the following problems:
a. The catastrophic winter breakdowns were symptomatic of structural problems that require fundamental change in virtually all aspects of the MBTA;
b. Measured against national benchmarks and other transit systems, the [MBTA’s] operating costs are too high and its productivity and performance were too low;
c. The MBTA is largely ineffective in managing its work due to weak workplace customs and practices;
d. Including vacation days, MBTA employees miss an average of 57 working days (11 to 12 weeks) per year; and
e. [The MBTA displays a] lack of customer focus [and] ... is not organized to operate as the customer-oriented business it is.
Complaint at para. 51. On April 15, 2015, Governor Baker asked all members of the board that oversees the MBTA to resign.
As noted above, Rodriguez’s complaint contains the following five claims: breach of contract against the *421 MBTA (Count I), unjust enrichment against the MBTA (Count II), breach of contract against Keolis (Count III), unjust enrichment against Keolis (Count IV), and violation of G.L.c. 93A, §9 against Keolis (CountV). As to the breach of contract claims against the MBTA, Rodriguez alleges that she paid the MBTA for monthly commuter rail passes in January, February, and March of 2015, and “(i]n exchange formonies paid, the MBTA contracted to provide timely, reliable commuter rail service to Plaintiff and the Class for each month.” Id. at paras. 78-79. Thus, “(f]or various reasons, the MBTA breached its contract with Plaintiff and the Class when it failed to provide timely, reliable service for January, February and March of 2015,” and as a result of this breach, she suffered monetary damages. Id. at 81. Rodriguez brings a nearly identical breach of contract claim against Keolis.
As to the unjust enrichment claims against the MBTA and Keolis, Rodriguez claims that she paid the MBTA and Keolis for monthly commuter rail passes in January, February, and March of 2015 and that they failed to provide the services they promised to her in January, February, and March of 2015, but “kept all of the monies paid by Plaintiff ... for these months.” Id. at paras. 84, 94. As a result, Rodriguez claims that the MBTA and Keolis have been unjustly enriched, and it would be unfair to allow them to keep the full monthly fare amounts she paid to them.
Finally, in Count V, Rodriguez asserts that Keolis violated G.L.c. 93A. She maintains that Keolis is engaged in trade or commerce within Massachusetts and that Keolis violated G.L.c. 93Aby among other things: failing to comply with “normal” monthly commuter rail schedules; failing to restore “normal” service to monthly commuter rail pass holders in a timely manner; failing to comply with the “winter recovery” commuter rail schedules; failing to operate the commuter rail service without significant delays or cancellations; failing to illuminate, heat, and limit overcrowding in commuter rail cars; and failing to adequately staff conductors on commuter rail trains. Commuter rail passengers were left stranded at commuter rail stations and were frequently herded onto overcrowded trains. Rodriguez claims that from January through March 2015, Keolis failed to inform her of schedule changes, cancellations, and delays in a timely and effective fashion, and that Keolis’ failure to prepare for and operate the commuter rail system in winter weather was done willfully and knowingly. She believes that these unfair and deceptive acts and practices caused her to suffer a loss of value of her monthly commuter rail pass.
DISCUSSION
When evaluating the legal sufficiency of a complaint pursuant to Mass.R.Civ.P. 12(b)(6), the court accepts as true all factual allegations in the complaint and all reasonable inferences that may be drawn in the plaintiffs favor. Berish v. Bornstein, 437 Mass. 252, 267 (2002). To survive a motion to dismiss, a complaint must set forth the basis of the plaintiffs entitlement to relief with “more than labels and conclusions.” Iannacchino v. Ford Motor Co., 451 Mass. 623, 635-36 (2008), quoting Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1964-65 (2007). While factual allegations need not be detailed, they “must be enough to raise a right to relief above the speculative level . . Id., quoting Bell Atlantic Corp., 127 S.Ct. at 1964-65. At the pleading stage, a complaint must set forth “factual ‘allegations plausibly suggesting (not merely consistent with)’ an entitlement to relief...” id., quoting Bell Atlantic Corp., 127 S.Ct. at 1966.
MBTA’s Motion to Dismiss
The MBTA moves to dismiss all of Rodriguez’s claims against it. It argues that the breach of contract claim should be dismissed for four reasons: (i) the tariff referenced on the monthly commuter rail pass governs the relationship between the MBTA and commuter rail monthly pass holders, it sets forth the only terms under which any of the amount paid for a pass may be refunded, and Plaintiff has not alleged that she complied with these terms—additionally, the tariff does not contain any representations that the MBTA will adhere to a particular schedule; (ii) the breach of contract claim is barred by the “filed rate” doctrine, which provides that where fares are determined in a heavily regulated process that is legislatively delegated to a public agency, contract claims seeking refunds or damages for unreasonable rates or inadequate service are barred; (iii) Rodriguez has failed to allege the necessary components of a breach of contract claim in that she cannot establish the contract term that the MBTA breached—her contention that the MBTA was contractually obligated to provide “timely and reliable commuter rail service” regardless of the weather conditions is wholly unsupported; and (iv) the breach of contract claim is actually a tort claim masquerading as a contract claim and Rodriguez cannot maintain a tort claim against the MBTA because (a) decisions about scheduling and operating trains during inclement weather are discretionary exercises of an essential government function, (b) a tort claim is barred by the economic loss doctrine, and (c) Rodriguez failed to properly present her tort claim to the MBTA under the Tort Claims Act, G.L.c. 258, §4.
As to the unjust enrichment claim, the MBTA responds that it cannot be “unjustly enriched” because the cost of fares do not even cover the cost of the services provided to passengers. It notes that the MBTA operates at a severe deficit and “receives significant taxpayer subsidies.”
The court will first briefly address the MBTA’s tariff and filed rate doctrine arguments as the court does not base its decision on either. The court considers the MBTA’s contention that the plaintiff has actually asserted a tort claim, together with the MBTA’s position that the plaintiff is unable to plead a breach of a *422 definable contract term, as the plaintiffs use of allegations that are more commonly associated with tort claims informs the contract claim analysis.
The Tariff and the Filed Rate Doctrine
Although the monthly pass that Rodriguez purchased included a legend that stated: “Subject to applicable tariff regulations and conditions of use,” it is not clear that the tariff was actually available for public inspection. Although, the MBTA is subject to statutory restrictions concerning the rates that it sets for its passengers, there does not appear to be any statutory obligation to file its tariffs with any state agency or to post them in a manner that makes them accessible to the public. Compare Maryland Casualty Co. v. NSTAR Electric Co., 471 Mass. 416, 426 (2015) (where, discussing electric rates, the Supreme Judicial Court (SJC) noted that electric companies must file schedules showing all rates and all forms of contract to be used in connection with those rates with the Department of Public Utilities), with G.L.c. 161A, §§5(d) & 5(r) (which address restrictions on the MBTA’s ability to increase rates but say nothing about filing or posting tariffs).
Moreover, the Massachusetts cases cited by the defendants in which damage claims were dismissed based on tariffs all involved the enforcement of specific limitation of liability clauses set out in those tariffs. See, e.g., Maryland Casualty Co., 471 Mass. at 419-20; FMR Corp. v. Boston Edison Co., 415 Mass. 393, 396 (1993) (where SJC dismissed claims based on a tariff which contained an exculpatory provision exempting Edison from liability for power interruptions); Lebowitz Jewelers Ltd., Inc. v. New England Telephone & Telegraph, 24 Mass.App.Ct. 268, 271-72 (1987) (same). Severail New York cases involving claims asserted by mass transit patrons against the New York metropolitan area transit authorities have similarly involved claims expressly foreclosed by limitation of liability clauses set out in a tariff. See, e.g., Stathakos v. Metropolitan Transit Authority Long Island Railroad, 109 A.D.3d 979, 980 (N.Y.Sup.Ct.App.Div.2d Dept. 2013) (“The tariff schedules specifically acknowledged the possibility that train service might be delayed or cancelled and clearly and unambiguously stated that no refunds would be given for such delays or cancellations”). In this case, the MBTA’s tariff explains how, and under what circumstances, a person who purchased a monthly pass and no longer wishes to use it may return it for a partial refund, but says nothing about limiting the MBTA’s liability for a failure to provide service. The MBTA argues that, by implication, the refund provision in the tariff sets out the only circumstances under which all or part of the money paid for a monthly pass may be returned. Perhaps, but that tariff meaning is certainly not self-evident. Cf. Maryland Casualty Co., 471 Mass. at 420 (where the court distinguishes between situations in which tariffs use words in a peculiar sense and extrinsic evidence is necessary to determine their proper application—in which case the matter must be returned to the regulatory commission which set the tariff for further action—from cases in which the meaning of the words is clear).
The filed rate doctrine is a close cousin to the concept that limitations of liability set out in tariffs must be enforced. “Under the filed rate doctrine, ‘any ’’filed rate"—that is, one approved by the governing regulatory agency—is per se reasonable and unassailable in judicial proceedings brought by ratepayers.’ Wegoland Ltd. v. NYNEX Corp., 27 F.3d 17, 18 (2d Cir. 1994). The doctrine is grounded on two rationales: first, that courts should not ‘undermine[ ] agency rate-making authority’ by upsetting approved rates (the principle of‘nonjusticiabilityj; and, second, that litigation should not become a means for certain ratepayers to obtain preferential rates (the principle of ‘nondiscrimination’). Marcus v. AT&T Corp., 138 F.3d 46, 58, 61 (2d Cir. 1998); see generally Keogh v. Chi. & Nw. Ry. Co., 260 U.S. 156 (1922)." Rothstein v. Balboa Ins. Co., 794 F.3d 256, 261 (2nd Cir. 2015). There appear to be no Massachusetts cases specifically addressing this doctrine; however, in Maryland Casualty, the SJC noted, with respect to electric rates, that invalidation of limitations of liability in a contract for the payment of rates that were set by the DPU after investigation and public hearings “would have effects beyond the clause itself. The limitation of liability was an inherent part of the rate set by the DPU, and . . . the rates as fixed by the DPU are established with the rule of limitation in mind . . .” 471 Mass. at 426 (internal quotations and citations omitted). Here, as explained above, there is no exculpatoiy clause set out in the tariff, but also, the rates are not set by an agency independent of the MBTA after a typical agency rate setting process. See, id. at 425-26 (describing the system of public hearings and investigation that the DPU must follow in setting electric rates). As noted above, there are significant limitations on the amount by which the MBTA may raise rates. See, e.g., G.L.c. 161A, §5(d) (setting out the process to be followed if the MBTA proposes to raise rates by more than ten percent). Nonetheless, the MBTA’s fare setting mechanisms do not provide the same rate setting processes described in most filed rate doctrine cases.
The court is not ruling that neither the limitation of liability that the MBTA suggests is implied in its tariffs nor the filed rate doctrine are necessarily inapplicable to the plaintiffs claims, but rather that there appear to be very novel and difficult issues to be confronted in applying them to this case, issues which the court need not address because the case can be decided by applying more traditional rules of contract law.
Has Rodriguez Stated a Claim for Breach of Contract in the Complaint?
After a thorough review of the complaint and the arguments of counsel, the court concludes that the *423 breach of contract claim against the MBTA must be dismissed because the complaint fails to allege an essential element of a breach of contract claim: an agreement between the parties on a material term of the contract at issue. “It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement.” Lambert v. Fleet Natl. Bank, 449 Mass. 119, 123 (2007), quoting Situation Mgt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878 (2000). “It is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract ...” Situation Mgt. Sys., Inc. v. Malouf, Inc., 430 Mass. at 878. However, the Supreme Judicial Court has recognized that, “(e)xpectations ... fall far short of a binding agreement.” Lambert v. Fleet Natl. Bank, 449 Mass. at 123, quoting Brighton Packing Co. v. Butchers’ Slaughtering & Melting Ass’n, 211 Mass. 398, 405 (1912). Here, while a contract may exist between a monthly commuter rail pass holder and the MBTA to allow passage on the commuter trains that the MBTA runs during the month, there is no contract term requiring the operation of any particular train. Stated differently, the MBTA had no express contractual obligation to provide “normal” or “regular” commuter rail service during and after the record-breaking snow storms in 2015, even though the plaintiff may have expected such rail service. Moreover, the complaint does not allege what either “normal” or “regular” mean, under these circumstances.
Rodriguez seemingly initially argues that her purchase of the monthly commuter rail passes constituted a contract and that the terms of this contract included the published commuter rail schedules, or something close to them. Citing Sears v. Eastern Railroad Co., 96 Mass. 433, 436 (1867), a case decided by the SJC approximately 149 years ago, Rodriguez contends that Massachusetts courts have held that when a person purchases a ticket for passage on a train, such a contract is created. In Sears, the plaintiff, David Sears, a resident of Nahant, Massachusetts, brought an action containing one count in contract and one in tort against the defendant railroad company after he purchased a package of five train tickets. Sears v. Eastern Railroad Co., 96 Mass. at 434-35. On September 9, 1865, Sears consulted a newspaper advertisement that advertised the latest night train that would travel from Boston to Lynn, Massachusetts on September 15, 1865. On September 15, after spending the day in Boston, Sears arrived at the defendant’s train station in Boston to take the scheduled 9:30 p.m. train back to Lynn. He planned to use one of the train tickets he previously purchased in the package of five. The ticket did not specify a particular train but was purportedly good for one passage between Boston and Lynn in 1865. Upon arrival at the station, Sears learned that the train he planned to take was postponed until 11:15 p.m. “on account of an exhibition.” Id. at 435. Sears was unaware of the train’s postponement and had only seen a notice of postponement, once, in 1864. Instead of waiting for the train, Sears hired a buggy to drive him to Lynn, arriving there around 10:30 p.m. As damages, he claimed the cost of the buggy ride home.
The defendant railroad occasionally postponed the train at issue, one to three times a month, so that members of the public could “attend places of amusement and instruction” and also during public holidays and other public occasions in Boston. Id. The defendant would notify members of the public through handbills posted in the defendant’s cars and stations. The defendant decided to postpone the train at issue on September 13 and gave notice through a printed and posted handbill. The newly-scheduled 11:15 p.m. train ultimately left Boston on time and arrived in Lynn at 11:45 p.m.
Judgment entered for the defendant in the Superior Court, and Sears appealed to the SJC. The SJC held that the defendants, “by failing to give such notice of the change made by them in the time of running their train on the evening referred to as the plaintiff was entitled to receive, violated their contract with him, and are liable in this action.” Id. at 438. The court wrote:
If this action can be maintained, it must be for the breach of the contract which the defendants made with the plaintiff. He had purchased a package of tickets entitling him to a passage in their cars for each ticket from Boston to Lynn. This constituted a contract between the parties. Cheney v. Boston & Fall River Railroad, 11 Met. 121; Boston & Lowell Railroad v. Proctor, 1 Allen, 267; Najac v. Boston & Lowell Railroad, 7 Allen, 329. The principal question in this case is, what are the terms of the contract? The ticket does not express all of them. A public advertisement of the times when their trains run enters into the contract, and forms a part of it. Denton v. Great Northern Railway, 5 El. & Bl. 860. It is an offer which, when once publicly made, becomes binding, if accepted before it is retracted. Boston & Maine Railroad v. Bartlett, 3 Cush. 227. Advertisements offering rewards are illustrations of this method of making contracts. But it would be unreasonable to hold that advertisements as to the time of running trains, when once made, are irrevocable. Railroad corporations find it necessary to vary the time of running their trains, and they have a right, under reasonable limitations, to make this variation, even as against those who have purchased tickets. This reserved right enters into the contract, and forms apart of it. The defendants had such a right in this case.
But if the time is varied, and the train fails to go at the appointed time, for the mere convenience of the *424 company or a portion of their expected passengers, a person who presents himself at the advertised hour, and demands a passage, is not bound by the change unless he has had reasonable notice of it. The defendants acted upon this view of their duty, and gave certain notices. Their trains had been advertised to go from Boston to Lynn at 9:30 P.M., and the plaintiff presented himself, with his ticket, at the station to take the train; but was there informed that it was postponed to 11:15. The postponement had been made for the accommodation of passengers who desired to remain in Boston to attend places of amusement. Certain notices of the change had been given; but none of them had reached the plaintiff. They were printed handbills posted up in the cars and stations on the day of the change, and also a day or two before. Though he rode in one of the morning cars from Lynn to Boston, he did not see the notice, and no legal presumption of notice to him arises from the fact of its being posted up. Brown v. Eastern Railroad, 11 Cush. 101; Malone v. Boston & Worcester Railroad, 12 Gray, 388. The defendants published daily advertisements of their regular trains in the Boston Daily Advertiser, Post and Courier, and the plaintiff had obtained his information as to the time of running from one of these papers, if they had published a notice of the change in these papers, we think he would have been bound by it. For as they had a right to make changes, he would be bound to take reasonable pains to inform himself whether or not a change was made. So if in their advertisement they had reserved the right to make occasional changes in the time of running a particular train, he would have been bound by the reservation. It would have bound all passengers who obtained their knowledge of the time-tables from either of these sources. But it would be contrary to the elementary law of contracts to hold that persons who relied upon the advertisements in either of those papers should be bound by a reservation of the offer, which was, without their knowledge, posted up in the cars and stations. If the defendants wished to free themselves from their obligations to the whole public to run a tram as advertised, they should publish notice of the change as extensively as they published notice of the regular trains. And as to the plaintiff, he was not bound by a notice published in the cars and stations which he did not see. If it had been published in the newspapers above mentioned, where his information had in fact been obtained, and he had neglected to look for it, the fault would have been his own.
Id. at 436-38. Thus, in Sears, the court determined that the purchase of a train ticket constituted a contract between the purchaser and the rail provider and that the ticket itself did not express all of the terms of the contract; advertisements detailing the train schedules also provided the contract’s terms. Id. at 436. Notably, the court recognized that railroad companies, under reasonable limitations, have a right to vary their schedules, even if passengers have already purchased tickets. Id. at 437. The court decided, however, that if a train fails to leave at a scheduled time, simply for the convenience of the company or a portion of the company’s expected passengers, a passenger is not bound by the schedule change if he or she did not have reasonable notice of it. Id. at 437. The Sears court reasoned that the defendant failed to advertise the schedule change in the newspapers and that the notices provided in handbills posted in the train cars and stations were inadequate. Id. at 438.
The SJC’s decision in Sears does not save the plaintiffs breach of contract claim in this case. As an initial matter, this court has serious doubts as to whether Sears, which was decided in 1867, is still good law. As of March 2016, only fourteen published decisions have cited Sears, and the most recent of these was decided on May 9, 1908. See C.W. Hunt Co. v. Boston Elevated Ry. Co., 199 Mass. 220, 240 (1908). At least one treatise, citing Sears, has recognized that some older cases, at one time, determined that an advertised timetable of a railroad constituted a general offer to the public, which became binding when a person accepted the offer by purchasing a ticket.[7] 1 Williston, Contracts §4:15 (4th ed. 2007). Commentary in Williston, however, expresses doubt that the purchase of a train ticket and a train schedule forms a binding contract. Id. This court similarly doubts that Sears is still good law, at least as it applies to an agency such as the MBTA, which is not a private railway company but rather a “body politic and corporate, and a political subdivision of the commonwealth.” G.L.c. 161A, §2.[8] The MBTA was established to respond to a “crisis” and to provide public transportation where private enterprise had failed. See Massachusetts Bay Transp. Authy. v. Boston Safe Deposit & Trust Co., 348 Mass. 538, 541-42 (1965). The court can take judicial notice of the fact that fares are inadequate to pay the operating cost of the service provided by the MBTA, which is subsidized by the Commonwealth and therefore by all taxpayers in Massachusetts.
Yet, even if this court were to assume that Sears is still good law and that the purchase of a ticket or a commuter rail pass results in the formation of a contract between a passenger and the rail operator, Sears is sufficiently factually dissimilar to the instant case that it provides no support for the plaintiffs contention concerning the terms of the contract that she alleges. The Sears court recognized that rail operators have the right to make reasonable changes to previously published rail schedules so long as the operators provide reasonable notice to potential passengers; that is an implied term in the contract created by the purchase of a ticket. Sears v. Eastern Railroad Co., 96 Mass, at 437. Moreover, in Sears, there was also no issue of extreme weather conditions causing trains to be delayed or cancelled. Rather in Sears, the *425 SJC found a breach of contract because if “the train fails to go at the appointed time, for the mere convenience of the company or a portion of their expected passengers, a person who presents himself at the advertised hour, and demands a passage, is not bound by the change unless he has had reasonable notice of it.” Id. In consequence, in Sears, the court found a breach because the plaintiff had not been provided notice that a specific train would not run on time, not because the railroad was unable to run it, but because the railroad voluntarily, for its own convenience, chose to delay it. Id.
By contrast, in the present case, the complaint alleges that the MBTA announced the cancellation of commuter rail service on various days as a consequence of extreme weather conditions and announced a winter recovery schedule in February 2015, and then failed to provide accurate and reliable communications regarding cancellations and delays during the winter recovery schedule. Apparently acknowledging that her contract with the MBTA could not possibly entail a strict obligation to run every train during this period at the times set out in the pre-snow emergency schedule, Rodriguez makes up a new contractual obligation: the MBTA breached its contract when it “failed to provide timely, reliable service for January, February and March of 2015." This is a contract term far beyond an implied obligation not to delay a specific train with inadequate notice for the convenience of the MBTA to the injury of a person who purchased a ticket. If the contract does not include the posted schedule of all trains as a contract term, where is the implied contract term that defines the MBTA’s obligation, and what is it? The plaintiff is unable to articulate one, as is the court.
Likely for this reason, the complaint is replete with allegations that the MBTA performed its statutory (or contractual) obligation to provide service in a negligent manner. She contends that the MBTA had “more than enough time to clear snow and return to a full commuter schedule” between storms, and it was “unclear why the Defendants could run one or two trains per line in the morning on a weekday, but not more than that.” She asserts that “years of MBTA mismanagement and a culture of indifference are the real reasons the MBTA failed Plaintiff and purchasers of monthly commuter passes and provided substandard service.” These allegations certainly imply that the plaintiffs claim is premised on the MBTA’s negligent failure to provide the service that a non-negligent transportation authority would have provided, even in the face of historically unprecedented amounts of snow. Perhaps that is true, but “negligence in the manner of performing [a contractual obligation], as distinguished from mere failure to perform it, causing damage, is a tort.” See Herbert A. Sullivan, Inc. v. Utica Mutual Ins. Co., 439 Mass. 387, 396 (2003) (citation omitted). Stated differently, the missing contract term that would define the MBTA’s contractual obligation to provide minimum service in the face of unprecedented snow storms cannot be supplied by alleging that the MBTA had a contractual obligation to provide the minimum service that a reasonably competent, professional transit authority would have provided under similar circumstances. That is a claim for professional negligence, which clearly is misplaced. Cf. Harris v. Magri, 39 Mass.App.Ct. 349, 352-53 (1995) (concluding in a legal malpractice action that asserted contract claim was nothing more than a restatement of negligence/tort cause of action). The plaintiff cannot assert a tort claim against the MBTA for all the reasons cited by the MBTA, but particularly because her claims for purely economic losses, in the absence of property damage or personal injury, are unrecoverable in tort. FMR Corp. v. Boston Edison Co., 415 Mass. at 395. Moreover, Rodriguez’s proposed standard would create potential claims for breach of contract every time a group of monthly pass holders were stranded on a platform waiting for a delayed or cancelled train: Was that a train that would have arrived but for the negligence of the MBTA?
The Unjust Enrichment Claim
Count II, which pleads unjust enrichment against the MBTA, also fails to state a claim on which relief can be granted. Unjust enrichment is the retention of money or property of another against the fundamental principles of justice or equity and good conscience. Santagate v. Tower, 64 Mass.App.Ct. 324, 329 (2005). “The underlying basis for [the award] ... is unjust enrichment of one party and unjust detriment to the other party.” Salamon v. Terra, 394 Mass. 857, 859 (1985). While it may be that under these circumstances, Rodriguez and other similarly situated monthly pass holders suffered an unjust detriment, it is clear that she has not and cannot allege unjust enrichment on the part of the MBTA.
As discussed above, Rodriguez claims that she paid the MBTA for monthly commuter rail passes in January, February, and March of 2015 and that it failed to provide the services that she expected in January, February, and March of 2015, but “kept all of the monies paid by Plaintiff... for these months.” Complaint at paras. 84, 94. It is not clear what the expression “kept all of the monies” is meant to convey, other than no refunds to monthly pass holders were tendered. The court may take judicial notice that the MBTA (and Keolis) had “teams ... working around the clock to get trains back on the tracks.” Jeremy C. Fox, More Trains Back in Service: But Frustration Still Widespread, Boston Globe, Mar. 7, 2015, atB. 1. There is no allegation, nor could there be, that the MBTA was not spending more resources returning some trains to service as they could be repaired, than it spent on regular service before the storms.[9] Moreover, according to the Massachusetts Department of Transportation, the MBTA loses more than $5.75 for every passenger trip on the commuter rail. See MBTA’s Memorandum in Support of Motion to Dismiss at Exhibit I. See also Matt Rocheleau, MBTA Anticipates Smaller *426 Budget Deficit Next Year, Boston Globe, Mar. 15, 2016, at B.4 (referencing MBTA’s fiscal year 2016 deficit of $95 million and projecting a deficit of $80.3 million for fiscal year 2017). Cf. Hollander v. Metropolitan Transportation Authority, 2015 WL 4077193, at*7 (N.Y.Sup.Ct. June 25, 2015) (Reed, J.) (dismissing unjust enrichment claim and acknowledging that New York Metropolitan Transportation Authority is heavily subsidized by State of New York, with transit customers paying only aporhon of the actual cost of transportation). Under these circumstances, Rodriguez’s claim for unjust enrichment, an equitable remedy, is dismissed.
This court sympathizes with the plaintiff and the other monthly purchasers of commuter rail passes who paid substantial sums for their monthly passes, many of whom undoubtedly relied on the commuter rail to reach their jobs. For many of these commuters, the absence of public transportation was undoubtedly a significant hardship. And for many, the MBTA’s offer of a fifteen percent discount for monthly passes purchased in May 2015 did not fully reimburse the expenses they incurred in finding alternative means of transportation during the winter of 2015. Nonetheless, frequently, when government fails to provide services of the quality and consistency that the public expects, recourse must be through political institutions, not through the courts.
Claims brought by patrons of the New York Metropolitan Transportation Authority appear to have generated most of the reported decisions on this topic. In Leeds v. Metropolitan Transportation Authority, 460 N.Y.S.2d 219, 220 (N.Y.Sup.Ct.App. Term, 1983), the court addressed a similar claim in the following manner:
More significantly, the defendant is a “public benefit corporation” (General Construction Law, §66, subd. 4) “performing a governmental function” (Public Authorities Law, §1202, subd. 2; §1264, subd. 2) ... It is not just a question of standing to sue. It is also that courts refuse to be embroiled “in the administration of programs the primary responsibility for which lies in the executive branch of government,” even though plaintiff seeks recompense for “disturbing and even dreadful conditions” which are “matters of common knowledge.” (Jones v. Beame, 45 N.Y.2d 402, 406-07, 408 N.Y.S.2d 449, 380 N.E.2d 277; Matter of Abrams v. New York City Transit Auth., 39 N.Y.2d 990, 387 N.Y.S.2d 235, 355 N.E.2d 289). And the rule must obtain with equal force where injunctive or declaratory relief is sought, or where (as here) damages are sought in the guise of an action for breach of contract. Presumably, the Transit Authority by reallocating its resources and personnel could remedy the particular shortcomings complained of here. But it is not our function to reorder governmental priorities, either directly by injunction or indirectly by countenancing a massive return of fares.
Similarly here, it is not the function of the court to determine whether the defendants did all that they reasonably could accomplish to return service following the unprecedented snow storms of 2015. It is certainly not a judicial function to decide if more funds should have been appropriated for the MBTA or fares set higher, such that it had better equipment and the resources with which to respond to the snow disasters. It is also not the function of the court to decide if the fifteen percent discount for May fares offered to riders was appropriate, especially considering the financial strain that the system already reports. Traditional common law and equitable causes of action are inapplicable to the claims asserted.
Keolis’ Motion to Dismiss
Rodriguez brings three claims against Keolis: breach of contract (Count III), unjust enrichment (Count IV), and violation of G.L.c. 93A, §9 (Count V). Keolis moves to dismiss all of the claims against it, and Rodriguez opposes the motion. After a thorough review of the complaint and the arguments of counsel, this court concludes that each of these claims must be dismissed for the reasons discussed below.
Breach of Contract
Keolis argues that it has no contractual relationship, express or implied, with Rodriguez. The court agrees. First, for the reasons stated above, an essential contract term is missing. However, even more fundamentally, Keolis only operates the system for the MBTA which is statutorily required to provide the service to patrons like the plaintiff. On February 5, 2014, the MBTA and Keolis entered into a Commuter Rail Operating Agreement (operating agreement) whereby Keolis agreed to undertake the operation and maintenance of the commuter rail system for the MBTA, effective July 1, 2014. See Massachusetts Bay Commuter Railroad Co., ILC v. Massachusetts Bay Transportation Authority, SUCV2014-00754-BLS1, slip op. at 1-7 (Mass.Super.Ct. Apr. 2014) (Kaplan, J.) (denying Massachusetts Bay Commuter Railroad Company, LLC’s motion for a preliminary injunction) & Copy of Portions of the Operating Agreement Attached to Keolis’ Memorandum. Indeed, the complaint itself makes clear that Rodriguez purchased her ticket from the MBTA, not Keolis. See Complaint at para. 24 {“The MBTA sells monthly commuter rail passes to commuter rail passengers based on ‘zone pricing’ ”) (emphasis added). She has not alleged any facts plausibly supporting the existence of a contract with Keolis.
Unjust Enrichment
The unjust enrichment claim (Count IV) fails to state a claim for similar reasons. Under the operating agreement, the MBTA is required to pay Keolis a fixed sum over a period of years for operating the system, subject to increases and potential penalties for poor performance; Keolis does not retain the plaintiffs or anyone else’s fares. In consequence, Keolis has not been enriched by the MBTA’s retention of fares, and Rodriguez’s unjust enrichment claim fails to state a claim upon which relief can be granted.
*427 Chapter 93A
Finally, Keolis moves to dismiss CountV, Rodriguez’s G.L.c. 93A claim against it. Keolis argues that because the MBTA contracted with Keolis to operate and maintain the MBTA’s commuter rail system, in fulfillment of the MBTA’s statutory mandate, Keolis is not engaged in trade or commerce with respect to commuters like Rodriguez, as a matter of law. Keolis also argues that Rodriguez’s complaint fails adequately to allege that it ■engaged in any unfair or deceptive practices. Rodriguez counters that the issue of whether Keolis is engaged in trade or commerce is not ripe for decision on a motion to dismiss and that it has alleged facts that sufficiently describe Keolis’ unfair or deceptive acts.
Under G.L.c. 93A, “[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.” G.L.c. 93A, §2(a). The SJC has long held that “the proscription in §2 of unfair or deceptive acts or practices . . . must be read to apply to those acts or practices which are perpetrated in a business context . . . The question whether a transaction occurs in a business context must be determined by the facts of each case. The factors we consider include the nature of the transaction, the character of the parties and their activities, and whether the transaction was motivated by business or personal reasons.” Poznik v. Massachusetts Medical Professional Ins. Assoc., 417 Mass. 48, 52 (1994) (internal quotations and citations omitted). The plaintiffs suggestion that a determination of whether the acts alleged in a complaint were undertaken in a business context generally requires factual development is simply inaccurate. That decision can often be made based on the pleadings. See, e.g., id. at 52-53 (affirming grant of a motion to dismiss Chapter 93A claims); Lantner v. Carson, 374 Mass. 606, 611-12 (1978) (same); and Brodsky v. New England School of Law, 617 F.Sup.2d 1, 7 (D.Mass. 2009) (same).
In the present case, it is clear that the MBTA is not engaged in trade or commerce when it performs its statutorily mandated task of providing mass transit service to the public. See Bretton v. State Lottery Commission, 41 Mass.App.Ct. 736, 739 (1998) (Chapter 93A claim not stated against the State Lottery Commission where “the activities of the commission are driven by legislative mandate, not business or personal objectives”). And, the plaintiff has not asserted such a claim against the MBTA. The question presented by Count V is whether a Chapter 93A claim may properly be asserted against a private company, like Keolis, which contracts with the MBTA to perform the MBTA’s statutorily mandated responsibility of operating and maintaining the commuter rail service. Keolis, of course, was motivated by business reasons when it submitted its bid to the MBTA for the award of the contract and entered into the operating agreement; and, it is certainly subject to potential Chapter 93A liability in some contexts. The court, however, concludes that it would be anomalous to hold that riders, disappointed by the service that they claim they are due from a public authority, can pursue a Chapter 93A claim against a contractor that would not lie against the authority. Stated differently, Keolis is engaged in a business transaction with the MBTA, but as to rail passengers, it is performing a statutorily mandated function on behalf of the MBTA and subject to the same statutory directives as the MBTA. While not completely analogous, the court notes that authorities themselves are not engaged in business when doing acts that fulfill statutorily mandated functions, but are simultaneously engaged in business and subject to Chapter 93A suits in other contexts. See Boston Housing Authority v. Howard, 427 Mass. 537, 539-40 (1998), and cases cited.[10] “The purpose of G.L.c. 93A is to improve the commercial relationship between consumers and business persons and to encourage more equitable behavior in the marketplace.” Poznik, 417 Mass. at 53. Keolis has a commercial relationship with the MBTA, but not with consumers, where it serves as a surrogate for the MBTA.
Leaving aside the question of whether Keolis is engaged in business vis-a-vis Rodriguez, the court also is in doubt as to whether plaintiff has alleged acts, which if true, constitute unfair or deceptive acts or practices within the meaning of Chapter 93A.
“[A] practice or act will be unfair under G.L.c. 93A, §2, if it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people.” Heller Fin. v. Insurance Co. of N. America, 410 Mass. 400, 408 (1991). While Massachusetts cases offer no static definition of the term “deceptive,” courts have stated that a practice is “deceptive,” for purposes of G.L.c. 93A, if the conduct could reasonably be found to have caused a person to act differently from the way he or she otherwise would have acted. Aspinall v. Philip Morris Cos., Inc., 442 Mass. 381, 394 (2004) (noting that “whether conduct is deceptive is initially a question of fact, to be answered on an objective basis . . .”). In addition, conduct is deceptive if it possesses “a tendency to deceive.” Id.
As recounted above, Rodriguez asserts that Keolis violated G.L.c. 93A by, among other things: failing to comply with “normal” monthly commuter rail schedules; failing to restore “normal” service to monthly commuter rail pass holders in a timely manner; failing to comply with the “winter recovery” commuter rail schedules; failing to operate the commuter rail service without significant delays or cancellations; failing to illuminate, heat, and limit overcrowding in commuter rail cars; and failing to adequately staff conductors on commuter rail trains. Rodriguez claims that from January through March 2015, Keolis failed to inform her *428 of schedule changes, cancellations, and delays in a timely and effective fashion, and that Keolis’ failure to prepare for and operate the commuter rail system in winter weather was done willfully and knowingly. She contends that these unfair and deceptive acts and practices caused her to suffer a loss of value of her monthly commuter rail pass.
Clearly, none of these allegations suggest any act of deception. Whether this conduct was so unfair as to give rise to a Chapter 93A violation in the context of efforts undertaken to respond to historic snow falls appears unlikely. Certainly, the court can say as a matter of law that Keolis cannot be held responsible for a failure to make capital investments in the commuter rail system in the past, so that it could respond to the weather catastrophe in the winter of 2015, as it only signed the operating agreement in July 2014. Ordering equipment that arrived late or was inoperable is similarly not attributable to Keolis. Additionally, decisions to favor high salaries over capital investment also are not the responsibility of Keolis. Working hard, but allegedly ineffectively, to restore service is generally not the stuff of which Chapter 93A claims are justified, and the balance of the allegations in the complaint appear to focus on policy decisions made long before Keolis contracted to run the commuter rail system. In any event, the court need not rest its decision on whether the allegations plausibly suggest a viable Chapter 93A claim against Keolis, as they all assert acts undertaken by Keolis to fulfill the MBTA’s statutory mandate.
ORDER
For the foregoing reasons, Defendant Massachusetts Bay Transportation Authority’s Motion to Dismiss is ALLOWED and Defendant Keolis Commuter Services, LLC’s Motion to Dismiss is JYLLDWED. Plaintiff Raquel Rodriguez’s First Amended Complaint is DISMISSED.

 Since all of Rodriguez’s claims are dismissed, she may no longer seek relief on behalf of a putative class. See Doe v. The Governor, 381 Mass. 702, 704-05 (1980) (noting that “if the individual plaintiffs may not maintain the action on their own behalf, they may not seek relief on behalf of a class”).

 tyhe court also takes judicial notice of certain facts, discussed below. See Jarosz v. Palmer, 436 Mass. 526, 530 (2002); Jackson v. Longcope, 394 Mass. 577, 580 n.2 (1985). Facts subject to judicial notice include “indisputable facts or matters of common knowledge.” Yankee Atomic Elec. Co. v. Secretary of the Commonwealth, 403 Mass. 203, 208 (1988). See Peters v. Delaware River Port Authority, 16 F.3d 1346, 1356-57 (3d Cir. 1994) (acknowledging court may take judicial notice of newspaper articles under certain circumstances).

 Although not alleged in the complaint, at oral argument plaintiffs counsel maintained that after receiving the defendants’ motions to dismiss, counsel attempted to obtain a copy of the tariffs and found that they were unavailable on the MBTA’s website and generally inaccessible to the public. For purposes of this motion, the court will treat those assertions as if they were included in the complaint.

 his court may take judicial notice of the historic snowfall that Boston received in 2014-2015. See Yankee Atomic Elec. Co. v. Secretary of the Commonwealth, 403 Mass. at 208; Commonwealth v. Kingsbury, 378 Mass. 751, 754 (1979) (recognizing that court has right to take judicial notice of subjects of common knowledge). According to the National Weather Service, Boston received 110.6 inches of snow during the 2014-2015 winter season. The Weather Channel, New England Record Snow Tracker: Boston Breaks All Time Seasonal Snow Record in 2014-2015, https: //weather, com/news/news /new-england-boston-re cord-snow-tracker. In February 2015, alone, Boston received 64.8 inches of snow. Id. To put these numbers in perspective, the average seasonal snowfall at Boston’s Logan Airport is 43.5 inches. Id.

 According to Williston, “In some of the older cases, the concept of a general offer made to the public was taken quite far. Thus, at one time it was determined that the advertised timetable of a railroad constituted a general offer to the public, which became binding when accepted by the purchase of a ticket. However, the obligation of a railroad or other common carrier to conform to its timetable seems primarily due to its obligations as a public service corporation, irrespective of contract, rather than to an obligation voluntarily assumed. While there is no doubt that the carrier must conform with published timetables so far as possible, it is generally excused from liability if any cause beyond its control makes it impossible or unreasonably difficult to adhere to the published time.” 1 Williston, Contracts §4:15 (4th ed. 2007).

 While, as explained above, the court has not decided this case based on the tariff, it notes that in Maryland Casualty, the SJC noted that “(i]n the late Nineteenth Century, [the] contract-based approach gave way to the now dominant tariff-based model for public utilities regulation” and declined to apply contract interpretation principles to the enforcement of tariff provisions. Maryland Casualty Co., 471 Mass, at 424. While the MBTA is not as constrained in setting fares as a utility is in setting rates, courts should nonetheless be wary of entering judgments that have the effect of interfering with highly constrained decisions concerning fares and allocation of scarce resources. See, infra, at 23.

 “Keolis must replace more than 50 motors inlocomotives. The locomotives each use four motors, and some may need more than one motor replaced.” Jeremy C. Fox, More Trains Back in Service: But Frustration Still Widespread, Boston Globe, Mar. 7, 2015, atB.l.

 Keolis has directed the court to two Superior Court decisions that have reached the same conclusion and dismissed Chapter 93A claims asserted against a private company performing a public function under contract with the government: Nestlenook, Inc. v. Atlantic Design Engineers, 17 Mass. L. Rptr. 25, 2003 WL 22670881, at *3 (Mass.Super.Ct. Oct. 22, 2003) (Hely, J.) (“[Defendant’s] dealings with [plaintiff] were solely as an agent for the town Planning Board in the course of the Planning Board performing its statutory duties under the Subdivision Control Law .. .”) and Shipps v. Compass Group United States, 15 Mass. L. Rptr. 299, 2002 WL 31480397, at *6 (Mass.Super.Ct. Sept. 23, 2002) (Houston, J.) (“[Defendant’s] performance of a function for which the government is traditionally responsible makes all of its conduct, not just conduct engaged in pursuant to the relevant statutory scheme, the conduct of the Commonwealth”). The plaintiff has not cited any case that has held otherwise.